THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JUAN SANTIAGO, Defendant-Appellant.

First District (2nd Division)   No. 79—2244

Opinion filed August 24, 1982.

Ralph Ruebner, Steven Clark, and Fe Fernandez, all of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Lester M. Joseph, and John M. Steed, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PERLIN delivered the opinion of the court:

Defendant, Juan Santiago, was charged in an information with murder. (Ill. Rev. Stat. 1975, ch. 38, par. 9—1.) In a jury trial defendant was found guilty of voluntary manslaughter and was sentenced to serve an extended term of 14 years in the Illinois Department of Corrections.

On appeal, defendant contends: (1) that he was not proved guilty beyond a reasonable doubt of voluntary manslaughter; (2) that the trial court erred in refusing to instruct the jury on the offense of involuntary manslaughter; (3) that defendant was prejudiced by the State's failure to timely disclose the criminal history of a witness which revealed that the witness had been seen by a psychiatrist and had been found to be unreliable and irresponsible; (4) that the trial court erred in questioning the jurors regarding their numerical division and in ordering them to continue deliberations after the court knew that the jury was divided in favor of a guilty verdict; (5) that defendant was prejudiced by testimony of a former assistant State's Attorney that he had the responsibility to determine whether criminal charges were meritable; (6) that defendant was prejudiced by certain remarks of the prosecutor in closing argument; and (7) that an extended-term sentence was improperly imposed.

Defendant was charged with the murder of David Pifer, who was killed in a fight between present or former members of two rival street gangs, the Ridgeway Lords and the Archdukes, during the early morning hours of June 26, 1977. Pifer did not belong to any gang but had a number of friends who were Archdukes.

James Banfi, president of the Noble Knights street gang, testified that he met defendant and several of his friends, all of whom were Ridgeway Lords, in front of Richard Gender's home at 2624 South 61st Avenue in Cicero on the evening of June 25, 1977. Banfi identified them as "Sinbad" (Scott Leituri), "Rusty" (defendant), Hector Padilla and Russell Radek. Banfi stated that Hector Padilla was in

possession of a small .25-caliber handgun. Banfi saw Radek hand a 9-millimeter pistol to defendant who placed it inside his pants under his shirt. Banfi identified People's Exhibit No. 3, a 9-mm. pistol, as the same weapon he had seen Radek give to defendant. Banfi then went inside the house.

Some time after Banfi went inside, James (Jim) Grzetic, his brother Jeff Grzetic, Ron Frank, Wayne Perepechko, Don Lanassa and David Pifer drove to Gender's home to retaliate for an incident which occurred a few hours earlier at an abandoned gas station near the Gender residence. In that earlier incident, which did not involve defendant, a group of Ridgeway Lords had "slapped around" Jim Grzetic, Perepechko and Lanassa. When they went to Gender's home, Jim Grzetic carried a baseball bat with him and Ron Frank took a hammer and a piece of lead pipe. Grzetic and Frank testified in a prior proceeding that they were not armed. Frank also failed to tell the Cicero police that he and Jeff Grzetic, who had a pocket knife, were armed. Jeff Grzetic and Ron Frank were former members of the Archdukes street gang. Jim Grzetic denied that he ever belonged to the Archdukes and there was no evidence that either Perepechko or Lanassa was an Archduke.

When the Grzetics and their friends arrived at the Gender home, Jim Grzetic saw the same persons he had encountered earlier at the abandoned gas station. Jeff Grzetic and Ron Frank approached the five or six persons who were standing in front of the house and Jeff challenged one of them, Scott Leituri, to a fight. After a few minutes of conversation, another Ridgeway Lord yelled "Lord Love" and struck Jeff in the upper left side of his rib cage with a baseball bat. At this point about 15 or 20 persons ran out of the Gender home armed with baseball bats and canes. Jeff Grzetic testified that two of the persons, whom he could not identify, had guns. Defending himself, Jeff Grzetic stabbed three or possibly four persons with his 3-inch pocket knife. During the course of the fight, Jeff Grzetic was also struck in the head with a baseball bat.

Jim Grzetic testified that he hit one person with his baseball bat, dropped it and ran north towards 26th Street when he saw "two guys run into the house after somebody shouted to go get the piece." Jim Grzetic, Ron Frank and Wayne Perepechko all testified that Don Lanassa and David Pifer were not armed and were not close to the group that was fighting. Jeff Grzetic did not see Pifer at the scene. After Jeff was struck in the head, Ron Frank came to his assistance. Both Jeff and Frank heard gunshots and ran north on 61st Avenue towards an alley near 26th Street. As they were running, both men

heard several more shots but did not see who was shooting.

Shortly after the fighting began, someone came to the basement window of the Gender residence where James Banfi was shooting pool and shouted, "There's a fight." Banfi exited the home and saw Pifer who was standing, unarmed, approximately 15 to 20 feet from the crowd. Pifer was coming toward the crowd but was not fighting. Banfi was pushed to the ground and then heard two gunshots. He did not know who was shooting. Banfi stood up and started to run across 61st Avenue. As he was running, he saw defendant in a kneeling position facing north towards 26th Street firing a pistol. Defendant was firing the same gun Banfi had seen Russell Radek hand to him earlier, People's Exhibit No. 3. Banfi almost ran into defendant as defendant was shooting and passed behind him. As he approached defendant, Banfi saw the left side of his face and recognized him as the person who had introduced himself earlier to Banfi as Juan Santiago. Defendant was wearing a light-colored sleeveless T-shirt and khaki pants. The lighting conditions in the area were very good. Banfi also observed David Pifer running north on 61st Avenue towards 26th Street but did not see him struck by any bullets.

Banfi admitted on cross-examination that he gave a statement to the Cicero police in which he said:

"I heard the shots, about four or five, and I ran and I almost knocked the guy down who was shooting. He was kneeling on the ground and I didn't even stop to see what he looked like.

I saw Russell Radek earlier in the evening with the gun. The small guy was carrying a .25 automatic. Hector Padilla had a .25 automatic in his pocket.

I took off and a few of the guys chased me but I ran.

Now that I think of it, the guy with the squeaky voice had the .9 millimeter, Juan Santiago."

On direct examination, Banfi testified that in talking with defendant he noticed that defendant had a "squeaky voice" and sounded "like he had a strep throat, ***." Two other witnesses for the State testified that defendant talked in a low, soft whisper.

Michael Masalski, who at the time of the incident was a good friend of defendant, testified that he also saw defendant shooting a pistol north towards 26th Street. Defendant was crouched on one knee behind a parked car on the east side of 61st Avenue with his hands braced on the trunk of the car. Masalski stated that defendant fired seven or eight shots in rapid succession from a 9-mm. semi-automatic Belgian Browning pistol. Masalski saw someone running towards 26th Street while defendant was firing but did not see anyone

get hit by the gunfire.

Masalski had driven to the party with defendant, Tony Gallo, Frank Padilla, Billy Fabsic and the owner of the car, Joe Roos. When he was inside the car, Masalski observed defendant load approximately 13 bullets into a 9-mm. pistol. He identified People's Exhibit No. 3, a 9-mm. pistol, as the one defendant used on June 26, 1977. Joe Roos, a defense witness and a friend of defendant, testified that he had a 9-mm. pistol in his automobile and had shown it to defendant on another occasion. Defendant knew the weapon was in the car. Roos admitted that People's Exhibit No. 3 was the same weapon.

Masalski testified that defendant was a Ridgeway Lord on the night he saw defendant firing the pistol. Masalski also stated that during the course of the trial, defendant threatened to kill him if he testified against him.

Masalski did not give a statement about the case to the Cicero police until one week before the trial. Masalski had attempt murder and armed robbery charges pending against him during defendant's trial but denied that any promises had been made to him in exchange for his testimony. He also denied being a Ridgeway Lord.

Jim Grzetic testified that after he began running north on 61st Avenue towards 26th Street he heard two or three shots being fired from across the street. He could not identify the shooter. Jim Grzetic had taken about 10 steps when he saw David Pifer who was also running from the scene. Moments later, Grzetic heard "a couple more shots" and Pifer said, "I'm hit," and fell forward on the street. In a prior statement to the police, Jim Grzetic stated that he had seen Pifer leaning against Ron Frank's Cougar after he had been shot. Grzetic admitted that this would have placed Pifer not near the alley but approximately 100 feet south of the alley at the time he was shot.

Jim Grzetic did not see any blood on Pifer. At the same time Pifer said that he had been hit, Jim Grzetic felt a tingling sensation in his leg and realized that he had been struck by a bullet. Grzetic turned around but could not determine from where the bullet had been fired. Grzetic managed to reach his aunt's house and was later taken to MacNeal Hospital. Grzetic said that Pifer fell near the intersection of 61st Avenue and an alley just south of 26th Street. The alley was approximately five houses north of the Gender home.

As Ron Frank and Jeff Grzetic reached the alley, Frank saw David Pifer standing near the alley, bleeding. Jeff Grzetic was taken to West Suburban Hospital for treatment of his injuries. He told the emergency room physician that he had fallen down some stairs. He did not tell the hospital personnel about the fight because he "was

scared" and "didn't want to get involved." He admitted that at the time of the incident he was on felony probation for two burglary convictions. He also admitted lying to the police when he told them that he had not stabbed anyone. Jeff Grzetic did not tell the police what had happened until after he spoke with representatives of the State's Attorney's office but denied that he had been granted immunity or promised any consideration by the State in return for his testimony.

Contrary to testimony he gave at a prior hearing, Ron Frank admitted at trial that he had been a member of the Archdukes. He stated that he left the gang "just before this incident happened." Frank admitted that he lied to the Cicero police when he told them he did not know any of the participants in the fight and did not see anyone get stabbed. Frank explained that he failed to tell the police that both he and Jeff Grzetic were armed because he was afraid of gang retaliation and because his "very good friend" Jeff was on probation.

Wayne Perepechko testified that he had seen David Pifer standing in the middle of 61st Avenue in front of the Gender residence. Pifer had no weapon. Perepechko heard yelling, saw people running and fled from the scene. As he left he heard gunshots. Perepechko admitted that he had previously denied under oath seeing Pifer in the area of the altercation and hearing shots.

After Pifer had been shot, Hector Padilla and Billy Fabsic pursued him down the street. Padilla ran over Pifer with Ron Frank's Cougar and Fabsic beat him with a cane. There was no evidence that defendant was present at this time. Pifer was found by Officer Robert Wegge of the Cicero Police Department, who rushed him to MacNeal Hospital. Wegge did not find any weapons on Pifer's body.

Investigator Joseph Bax of the Cicero police attempted to interview David Pifer in the emergency room at MacNeal Hospital. By moving his head up and down or from side to side, Pifer indicated in response to Bax' questions that he knew and could identify but was not able to name the person who had shot him. Pifer responded affirmatively when Bax asked him whether his assailant was a member of the Ridgeway Lords. Pifer then lost consciousness and died at 4:07 a.m. on June 26, 1977.

Christopher F. Jagiello, an evidence technician with the Cicero Police Department, spoke with defendant at 7 a.m. on June 26, 1977. Defendant told Jagiello that he could show him and another officer where he had seen the shooter the previous evening. Defendant directed them to 2617 South 61st Avenue which is located on the east side of the street and slightly north of the Gender residence at 2624 South 61st Avenue. Defendant told Jagiello that the shooter had stood

near a service walk in front of 2617 South 61st Avenue and had held his weapon in a two-handed grip pointing north towards 26th Street. Approximately three to four feet from where defendant said the shooter had stood, Jagiello found nine expended 9-mm. shell cases and one live 9-mm. round.

While they were at the scene, defendant told Jagiello that he did not know the name of the shooter but said that he was 5'10" tall. Defendant said that after firing his weapon the shooter fled east through a hallway between 2617 and 2619 South 61st Avenue towards an alley near Austin Boulevard.

Defendant was taken back to the police station at 7:30 a.m. and Jagiello returned to the scene with other men to look for additional firearms evidence. Although they found no other shell cases, the police did find a fresh bullet hole in a stop sign on the southeast corner of 61st Avenue and 26th Street and a bullet jacket and fragments from a bullet which had passed through the window of a beauty shop located on the northwest corner of 61st Avenue and 26th Street. Additional bullet fragments were recovered from the left front tire on Ron Frank's Mercury Cougar. In Jagiello's opinion, the crime scene showed the presence of only one weapon, a 9-mm. pistol.

At approximately 10 a.m. on June 26, 1977, defendant gave a handwritten signed statement to Officer Jagiello and Investigator Leo Warner. Jagiello published the statement (People's exhibit No. 29) to the jury.

In that statement defendant said that he saw a tall thin man standing in the middle of 61st Avenue pointing a gun at a crowd of persons. The man started shooting in all directions and defendant ran from the scene after one of the man's friends hit defendant with a baseball bat. Defendant described the shooter as 5'10" tall, thin build, neat, short cut hair, neat clothes, and approximately 23 or 24.

Together with three other officers, Jagiello interviewed defendant again on June 26, 1977, at approximately 4 p.m. Defendant told the officers he could show them where the shooter had discarded his weapon and directed them to 2619 South 61st Court. Defendant took Investigator Bax and assistant State's Attorney James McCarter to some flower bushes in the backyard of 2619 South 61st Court where Bax found People's exhibit No. 3, a 9-mm. Browning semi-automatic pistol. The gun was recovered in an area that is due west of 61st Avenue and thus in the opposite direction from where defendant originally had said the shooter had fled. Jagiello carefully picked up the weapon and sent it to be processed for latent fingerprints.

Joseph Swarez, an evidence technician with the Cook County

sheriff's police, found no fingerprints, no partial prints and no smudges on either the weapon or on the magazine. Since the weapon had a hard smooth surface conducive to picking up fingerprints, Swarez concluded that the gun could have been wiped clean. Jack Welty, a firearms examiner with the forensic crime laboratory located in Maywood, compared a spent projectile jacket removed from Jim Grzetic's ankle at MacNeal Hospital with test bullets fired from People's exhibit No. 3. He concluded that the bullet jacket had been fired from People's exhibit No. 3. Welty also determined that the nine expended cartridge cases recovered at the scene and the bullet jacket found in the beauty shop had all been fired from the same weapon, People's exhibit No. 3.

Dr. James Lawrence Frost, a forensic pathologist and deputy medical examiner, performed the autopsy on the body of David Pifer. Pifer was 5'6" tall, weighed 145 pounds and had a mustache. Dr. Frost testified that the cause of Pifer's death was a gunshot wound to the chest and abdomen. The bullet entered Pifer's back, traveled "very slightly from the right to the left side" and upwards as it passed through the body and exited his chest. In Dr. Frost's opinion, the bullet was fired from an area somewhere to the right of Pifer. Dr. Frost stated further that the wound was consistent with one a bullet would make if it had been fired by a person in a crouch and had struck a person who was leaning forward in a running position. Based on the size of the entry wound, the bullet which struck Pifer was medium caliber in size. According to Dr. Frost, a 9-mm. bullet would be considered medium to large. He could not, however, determine the actual gun that had been used or the exact caliber. In the course of his autopsy Dr. Frost also noticed that the body had multiple contusions, abrasions and lacerations, including four lacerations to the scalp. In Dr. Frost's opinion, none of these latter injuries could have caused David Pifer's death.

Investigator Bax testified that assistant State's Attorney James McCarter took a court reporter statement from defendant shortly after 6 p.m. on June 26 which defendant read, initialed and signed. Bax published the statement (People's exhibit No. 25) to the jury.

In his statement, defendant said that Russell Radek, whom he had known for five years, had fired approximately six hollow-point bullets from a Browning 9-mm. pistol which defendant had seen earlier in a bathroom in the Gender home. After he fired the gun, Radek threw the weapon to defendant and told him to hold it. Defendant hid the gun in some leaves and retrieved it for the police and McCarter at approximately 4:30 p.m. on June 26.

Based on defendant's statement, Russell Radek was charged with murder. Hector Padilla and Billy Fabsic were also charged with murder, Padilla for driving the car that hit Pifer and Fabsic for beating Pifer with the cane.

Assistant State's Attorney Salvatore Marzullo testified that he took two statements from defendant on July 8, 1977. Defendant gave Marzullo an oral statement some time between 5:30 and 6:30 p.m. Defendant said that he wanted to tell Marzullo something about the killing that happened in Cicero. Defendant then told Marzullo that "the person you have in custody [Russell Radek] didn't do the shooting. I did it." Defendant said that he did not want to "punk out" and let Radek "take the rap alone." Defendant told Marzullo that he was at a party in Cicero with some of his friends. They were standing in the street when "a bunch of cars pulled up," one of which was a white Cougar. A fight broke out between the persons who were in the cars and those at the party. Defendant ran across the street and started shooting at the persons getting out of the Cougar with a 9-mm. Browning semi-automatic pistol. According to Marzullo, defendant's exact words were, "I started popping caps at them."

At the conclusion of the oral statement, defendant agreed to give a written statement. At approximately 8:50 p.m. on July 8, 1977, about three hours after defendant's oral statement, defendant made his third written statement (People's exhibit No. 27) concerning the shooting which Marzullo published to the jury.

In his statement, defendant said that he had gone to a party at the Gender home with a number of his friends. Defendant left the party and returned with a loaded 9-mm. Browning automatic pistol. A number of cars containing Archdukes drove up in front of the Gender home about 1 a.m. The Archdukes were looking for Scott Leituri. The last car to arrive at the scene was a white Cougar. After the four persons in the Cougar got out of the car and joined the fight that was already in progress, defendant began to shoot at the car. There were two cars in front of the Cougar in the street. Defendant fired three shots and then the gun jammed. Two live rounds fell out of the gun onto the ground. Defendant did not see anyone hit as he was firing. After the gun jammed, defendant handed the weapon to Russell Radek and immediately started to run from the area. Radek then began shooting. He did not know how many shots Radek fired but said that after he gave the gun to Radek and started to run toward a gangway, he heard someone (apparently David Pifer) shout, "I'm hit." Defendant later found out that Pifer had been shot. According to defendant, the person who had been hit stood up and pulled out a knife. Defend-

ant admitted, however that he had not seen any knife. After the shooting stopped, Radek caught up with defendant in a gangway and returned the gun to him. Defendant hid it in some leaves and later retrieved it for assistant State's Attorney McCarter. Defendant told Marzullo that no one else from "his group" had a gun at the party. Defendant refused to sign the written statement after it had been transcribed. After entering into certain stipulations with the defense and having 49 exhibits admitted into evidence, the People rested.

Defendant presented seven witnesses, most of whom were good friends of defendant and present or former members of the Ridgeway Lords street gang. Their testimony, in substance, was that David Pifer had approached the persons at the party, started a fight and stabbed several of them. Those witnesses who saw the fight start testified that Pifer was driving the white Mercury Cougar and that the fight began after Pifer arrived in that car. Several of these witnesses did not blame Pifer as the instigator until they testified in defendant's behalf. None of the witnesses who described Pifer or identified his photograph had ever seen him before the night he was killed. These witnesses had difficulty describing or even remembering anyone else present at the fight other than Pifer. Two of defendant's witnesses admitted to prior felony convictions.

Wayne Kutnick, one of defendant's witnesses, testified that he was outside of the Gender home when the fight broke out. Kutnick heard three or four gunshots, hit the ground and saw Russell Radek running towards the Gender residence. Radek was on the same side of the street as the Gender house, the west side. After he saw Radek run away from the scene, Kutnick heard about a dozen more shots come from across the street.

The defendant also testified in his own behalf. He admitted firing People's exhibit No. 3, the 9-mm. pistol, but stated that he was firing at the gas tank of the white Mercury Cougar in order to blow it up. Defendant explained that he wanted to create a diversion to protect his friends who were being "roughed up." Although defendant was only 10 feet from the rear passenger side of the Cougar, when he fired the gun, the only bullet hole in the Cougar was located in the front driver's side tire.

Defendant stated that Russell Radek grabbed the gun from him after he fired three shots and began to fire in all directions. Defendant also stated for the first time at trial that in addition to himself and Radek, there was a third person, whom he had never seen before, standing in the street firing a pistol.

Defendant explained that the third gunman was not mentioned in

the confession he gave to Marzullo because Marzullo and the court reporter who took his written statement had fabricated answers in an attempt to incriminate him. Defendant admitted that he had taken off the T-shirt he had on during the fight and replaced it with a dress shirt "so I wouldn't be recognized as being involved, ***, in the incident." Although defendant was the last person to handle the pistol, he did not leave any fingerprints on it because he had "carefully" touched just the stock.

In contrast to the testimony of all the other witnesses, defendant stated that there was a fight in progress in front of the Gender home at the time the white Mercury Cougar was stopping.

Defendant was found guilty of voluntary manslaughter and was sentenced to serve an extended term of 14 years in the Department of Corrections.

I

Defendant first contends that he was not proved guilty beyond a reasonable doubt where the State's eyewitnesses were severely impeached and where the verdict did not negate every reasonable hypothesis of innocence.

■ With respect to the latter contention, it was not incumbent upon the State to exclude every reasonable hypothesis of innocence. Even if the testimony of James Banfi and Michael Masalski is treated as circumstantial and not eyewitness evidence that defendant fired the bullet which killed Pifer, defendant admitted to assistant State's Attorney Marzullo that Radek "didn't do it [the shooting]. I did it." Given defendant's admission, the case against him cannot be considered entirely circumstantial. Thus, in this case, the State was not required to exclude every reasonable theory of defendant's innocence. It should be noted in this regard that defendant does not object to the deletion of the second paragraph of the circumstantial evidence instruction, Illinois Pattern Jury Instructions, Criminal, No. 3.02 (1968).

Two witnesses, James Banfi and Michael Masalski, identified defendant as the person who was firing People's exhibit No. 3, a 9-mm. semi-automatic pistol, north on 61st Avenue towards 26th Street. Both witnesses testified to having seen defendant fire the second series of gunshots although neither saw whether Pifer was hit by any of those shots.

Defendant attacks the credibility of both witnesses. Banfi may have had a bias against the Ridgeway Lords because they were a rival street gang. Yet the substance of Banfi's testimony was unimpeached.

Defendant purports to find inconsistencies between Banfi's testimony and his statement to the police on August 19, 1977, two months after the shooting. In that statement Banfi said that, "I ran and I almost knocked the guy down who was shooting. He was kneeling on the ground and I didn't even stop to see what he looked like." In the same statement, however, Banfi also told the police, "Now that I think of it, the guy with the squeaky voice had the .9 millimeter, Juan Santiago." Banfi, of course, had testified that Radek had handed the 9-mm. to defendant earlier in the evening.

A reasonable interpretation of Banfi's police statement is that defendant was shooting the 9-mm. pistol. There is no irreconcilable inconsistency between Banfi's testimony that he saw the left side of defendant's face and recognized him as defendant and his statement to the police that he "didn't even stop to see what he looked like." Defendant's theory that Banfi did not recognize the shooter and filled in the gap based on his knowledge that defendant had had the weapon in his possession earlier is pure speculation. We have examined defendant's other instances of Banfi's inconsistent statements and find them to be minor

Banfi's testimony was substantially unimpeached. That testimony established that after Banfi heard two gunshots, he ran into the street in front of the Gender home and saw defendant firing a 9-mm. pistol north towards 26th Street. This testimony, of course, contradicted defendant's version that he gave the weapon to Radek after he fired the first three shots.

The second person who testified that he saw defendant firing the pistol was Michael Masalski. Masalski's testimony was impeached in several respects: Masalski did not make any statements to the police until one week before trial and he had attempt murder and armed robbery charges pending against him during defendant's trial. Although he denied that any promises had been made to him in exchange for his testimony, Masalski may have expected favorable treatment from the State. Since his testimony was corroborated by James Banfi, however, that expectation does not render his testimony unworthy of belief.

Defendant suggests that there is a discrepancy regarding the location where Banfi and Masalski saw defendant shooting. Banfi testified that defendant was standing in the street. Masalski did not say, however, whether defendant was firing from the street side or the curb side of the vehicle. The precise location is a minor inconsistency.

Finally, defendant claims that it is suspicious that Masalski could identify the weapon defendant was firing as a 9-mm. Belgian Brown-

ing pistol when "he had not been able to describe the make and model of the gun he had supposedly seen much more closely while riding in the car." Masalski, however, may have based his description of the weapon on what he had observed while he was in the car with defendant.

Indirect corroboration for Banfi's and Masalski's testimony that defendant was the lone gunman was provided by Wayne Kutnick, a defense witness, who testified that he saw Radek flee from the scene during the shooting.

The key question in this case was whether the bullet that killed Pifer, which was not recovered, was fired from People's exhibit No. 3. Although defendant testified that both Radek and a third person were firing, the jury could have chosen not to believe defendant's testimony, particularly since he gave so many inconsistent statements. All the ballistics evidence—the expended cases and the live round found at the scene, the bullet jacket taken from the beauty shop and the bullet jacket removed from Jim Grzetic's ankle—were linked to People's exhibit No. 3. There was no ballistics evidence that any other gun had been fired.

Although defendant gave the police and the prosecutors a number of different statements, he did tell assistant State's Attorney Marzullo that "the person you have in custody [Russell Radek] didn't do the shooting. I did it." Defendant told Marzullo that he "started popping caps at them [the persons in the white Cougar]" as they were getting out of the car. Dr. Frost testified that the bullet wound was caused by a medium caliber bullet and that a 9-mm. bullet is considered a medium caliber.

Jim Grzetic testified that he heard two or three shots, then began to run in a northerly direction. David Pifer ran along with him. Moments later Jim Grzetic heard "a couple more shots" and Pifer said, "I'm hit," and fell forward on the street. At the same time Pifer said this, Jim Grzetic felt a tingling sensation in his leg and realized that he had been struck by a bullet. Grzetic's testimony indicated that they were both hit at approximately the same time. This would suggest that both were being fired upon by the same shooter. Since the bullet removed from Jim Grzetic's ankle was linked to People's exhibit No. 3, the bullet that killed Pifer was apparently fired from the same weapon. Moreover, if the jury chose to believe that defendant was the only person firing People's exhibit No. 3, then Pifer would have been killed in the same burst of gunfire that wounded Jim Grzetic.

Based on his testimony that he fired only the first three shots, defendant argues that Jim Grzetic's testimony indicates that Pifer

was killed by someone other than defendant. This argument, however, assumes that the jury had to accept defendant's trial testimony and reject the testimony of Banfi, Masalski and Kutnick, which, together with defendant's admissions, showed that defendant was the lone gunman firing both series of gunshots. As indicated above, the jury was not required to discount their testimony. Moreover, defendant's argument also assumes that Pifer could not have been hit by the first series of shots which defendant admitted firing. Given the short interval between the first and second series of shots, it is not unreasonable that Pifer was hit by one of the first three shots and did not cry out until the second series began moments later.

In addition to the foregoing evidence, it must be noted that defendant changed clothes after the shooting to avoid detection, that the murder weapon which defendant handled last was wiped clean of fingerprints, and that defendant threatened to kill Michael Masalski if he testified against him.

In essence, defendant's argument that he was not proved guilty beyond a reasonable doubt would require this court to usurp the function of the jury as the trier of fact and to engage in speculation. This we cannot do. In our judgment, there was sufficient credible evidence on which the jury could have concluded that defendant was guilty of voluntary manslaughter.

## II

Defendant next contends that the trial court erred in refusing to instruct the jury on the lesser included offense of involuntary manslaughter.

Defendant's testimony relevant to this issue is that as he returned to the party at the Genders' home he saw a crowd gathered in the middle of the street. He saw persons he did not know swinging bats and sticks at his friends who were unarmed. He saw one of his friends clutch his throat as blood came from it. Defendant heard women screaming and glass breaking. In response, he obtained a 9-mm. pistol from a friend's car, positioned himself behind a white Mercury Cougar which was in the center of the altercation and "looked around to see if anybody I knew was around me," and fired three shots into the white Mercury Cougar. Defendant explained that he fired at the gas tank of the car, trying to ignite it and create a diversion to break up the fight, because he had seen his friends "getting roughed up bad." Defendant had given the same explanation in his written statement to assistant State's Attorney Marzullo. There was no testimony indicating how close anyone was to the Cougar when

defendant began shooting.

Defendant contends that the jury should have been instructed on involuntary manslaughter based on this testimony. If there is some evidence in the record which would reduce the crime to involuntary manslaughter, the defendant is entitled to an instruction defining the lesser offense. *People v. Boisvert* (1975), 27 Ill. App. 3d 35, 325 N.E.2d 644.

Involuntary manslaughter is an offense which occurs without the intent to kill and death results from acts which were recklessly performed. (Ill. Rev. Stat. 1975, ch. 38, par. 9—3.) A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow and such disregard constitutes a gross departure from the care which a reasonable person would exercise in the situation. (Ill. Rev. Stat. 1975, ch. 38, par. 4—6.) If defendant's testimony were believed, the jury reasonably could have found that defendant's conduct constituted evidence of recklessness and returned a verdict of involuntary manslaughter.

In *People v. Kelly* (1975), 24 Ill. App. 3d 1018, 322 N.E.2d 527, defendant testified that he had intended to fire a warning shot at the victim. The gun was pointed at the victim when the fatal shot was fired. The court found that under these circumstances there was a jury question as to recklessness. See also *People v. Hines* (1975), 31 Ill. App. 3d 295, 334 N.E.2d 233.

The State argues that no involuntary manslaughter instruction was appropriate where there was no claim of an accidental discharge of the weapon, where defendant's theory was that he was acting in defense of others and where defendant's act had the natural tendency to cause death or great bodily harm.

■ With respect to the first point, recklessness and accident are not synonymous. Recklessness requires a conscious awareness of a risk and a disregard of that risk. While an accident may result from negligence, negligence is not recklessness. As indicated in *Boisvert*, an accidental discharge of a weapon would not render a person guilty of involuntary manslaughter.

The State's second justification for refusing an involuntary manslaughter instruction is that a defense theory of self-defense or defense of a third party is inconsistent with the crime of involuntary manslaughter. (See, *e.g.*, *People v. Adams* (1980), 91 Ill. App. 3d 1059, 415 N.E.2d 610; *People v. Mitchell* (1973), 12 Ill. App. 3d 960, 299 N.E.2d 472.) In *Mitchell* the court said:

> "The theory of defense at trial was self-defense or defense of a third party. It has been held that since self-defense (or defense

of a third party) presupposes the intention to kill or cause great bodily harm, said defense is inconsistent with the crime of involuntary manslaughter since the latter offense, by definition, is evidenced by the mental state of recklessness, not intent." 12 Ill. App. 3d 960, 965.

■ The difficulty with this reasoning, insofar as it pertains to the facts in the case before us, is that in defending oneself or another, one does not invariably intend to kill or cause great bodily harm. A person may fire a weapon, not to kill, but to scare the assailant away or to divert his attention so that a third party may escape. In *People v. Williams* (1973), 15 Ill. App. 3d 303, 308, 304 N.E.2d 178, the court stated that "[t]o say that a person claiming to have acted in self defense may not be convicted of involuntary manslaughter, simply because of that claim, is to argue a proposition unsupported by reason or authority."

■ Finally, citing *People v. DeMumbree* (1981), 98 Ill. App. 3d 22, 424 N.E.2d 73, the State argues that where defendant voluntarily and wilfully commits an act which has the natural tendency to cause death or great bodily harm, an involuntary manslaughter instruction is not warranted. The State suggests that by attempting to "blow up" an automobile so closely situated to so many persons, the defendant clearly acted with the intent to kill or injure someone. In *DeMumbree*, however, the defendant admitted that he fired a shotgun directly at a crowd of persons and, after the crowd moved back, fired again in the exact direction in which the crowd had retired. In *People v. Mitchell* the defendant knew he was firing directly into a crowd. This is significantly different from firing at an empty car with the intent of causing a diversion by possibly igniting the gas tank. The likelihood of injury or death is more remote. We note in this regard that there was no evidence that anyone was standing near the Cougar when defendant opened fire. We conclude that the trial court should have given the jury defendant's instruction on the lesser included offense of involuntary manslaughter. Since that instruction was not given, defendant is entitled to a new trial.

## III

In addition to the trial court's failure to properly instruct the jury, we must also reverse defendant's conviction because of the court's improper questioning of the foreman of the jury as to the progress of the jury's deliberations which questioning, in our opinion, may have coerced a verdict of guilty.

The jury began deliberating late in the afternoon of October 22, 1979. At approximately 10 a.m. on October 24, the jury sent the court a note stating that it was deadlocked. The jury was called into the courtroom and the following colloquy took place between the court and the foreman of the jury:

"THE COURT: Mr. Foreman, that is the situation at the present time?

MR. FOREMAN: Yes, it is.

THE COURT: Have you been deliberating?

MR. FOREMAN: Yes, sir.

THE COURT: And how do you stand as to a decision?

MR. FOREMAN: Eight—

MR. BEDRAVA: —Your Honor, may we approach the bench?

THE COURT: Just want a division, not whether it is guilty or not guilty.

(Whereupon a conference out of the presence of the jury and the Court Reporter.)

THE COURT: I don't want to know guilty or not guilty. Just your division as to the deadlock.

MR. FOREMAN: It is guilty.

THE COURT: No, no. Don't want to know whether guilty. I want to know the division. How you stand in the deadlock.

MR. FOREMAN: The number?

THE COURT: Just numbers.

MR. FOREMAN: Eight and four.

THE COURT: That is it. All right."

The court then gave the jury a *Prim* instruction. (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601.)[1] The jury retired for further deliberations. Defense counsel made a motion for a mistrial because of the information given by the foreman but the court denied the motion. The court also said that the "jury told him [someone not identified] just what the division was." Later that evening, the jury was sequestered for the night.

At 1 p.m. on the following day, October 25, the jury was returned to court and the foreman was asked whether the jury was still deliberating. After the foreman responded affirmatively, the jury was sent back for further deliberations. At some point later that day, apparently in the evening, the jury was recalled a second time and the

---

[1]In *People v. Prim* (1972), 53 Ill. 2d 62, 75-76, the supreme court set forth a jury instruction which was formulated to guide juries that have reached an impasse in deliberations. That is the instruction which was given here.

court again asked the foreman for a division. The foreman said, "Eleven, one." The court asked the foreman whether the jury needed more deliberations. The foreman answered, "I truthfully cannot answer whether it would help or not." The court then ordered the jury to deliberate further.

Again on the evening of October 25, the jury was called into court a third time. The court inquired whether the jury had been making any headway and the foreman said, "No, sir, we have not." The court asked if the jury wanted "a little more time" and the foreman said, "Yes." The court sent the jury back for further deliberations.

At an unspecified time later that evening the court, apparently at the foreman's request, sequestered the jury for the evening. Before sequestering the jury, the court inquired, "Anything else?" The foreman replied, "Yes, your Honor. The majority of the jury feels ---." The court interjected, "I am not interested in anything else, sir," and sequestered the jury. The following morning the jury returned a verdict of voluntary manslaughter. The jury was polled and no juror expressed disagreement with the verdict.

Defendant contends that the actions of the trial court in repeatedly calling the jury into open court, asking the numerical division of the jury and ordering them to continue deliberations after the court became aware that the majority of the jurors was in favor of a verdict of guilty and after the foreman indicated that he did not know whether further deliberations would help, coerced the minority into returning a verdict of guilty. We agree.

In *Brasfield v. United States* (1926), 272 U.S. 448, 71 L. Ed. 345, 47 S. Ct. 135, cited by defendant, the United States Supreme Court held that it is *per se* reversible error for the trial court to inquire into the numerical division of a jury. The decision in *Brasfield*, however, was not based on constitutional interpretation but on the Supreme Court's supervisory powers over the Federal judiciary and thus is not controlling in a State proceeding. *People v. Kirk* (1979), 76 Ill. App. 3d 459, 467, 394 N.E.2d 1212, *cert denied* (1980), 447 U.S. 925, 65 L. Ed. 2d 1118, 100 S. Ct. 3019; *Ellis v. Reed* (4th Cir. 1979), 596 F. 2d 1195, *cert. denied* (1979), 444 U.S. 973, 62 L. Ed. 2d 388, 100 St. Ct. 468; *State v. Morris* (Mo. 1971), 476 S.W.2d 485; *State v. Rickerson* (1981), 95 N.M. 666, 625 P.2d 1183; but see *People v. Wilson* (1973), 390 Mich. 689, 213 N.W.2d 193.

In Illinois, it is improper for the trial court to inquire into the numerical division of the jury. (*People v. Duszkewycz* (1963), 27 Ill. 2d 257, 189 N.E.2d 299; *People v. Golub* (1929), 333 Ill. 554, 165 N.E. 196.) The rationale for this rule was set forth in *Golub*:

"A verdict should express the deliberate judgment of the jury. The juror, as well as the judge, has an independent duty to perform, and he ought to be left free to pronounce his own conviction. A verdict hastened by the action of the judge, however worthy the motive, cannot be the result of that deliberation which the law guarantees. Remarks by a trial judge calculated to effect the rendition of a verdict without affording the jury an opportunity for careful consideration are unwarranted and often lead to great abuse." 333 Ill. 554, 561.

■ Unlike the rule adopted in *Brasfield v. United States*, however, it is not *per se* reversible error in Illinois to inquire into the numerical division of the jury. Whether the error is harmless or prejudicial depends on the facts of the case. (*People v. Golub* (1929), 333 Ill. 554, 561.)[2] The State concedes that the trial court's inquiries were improper but argues that they were harmless. We cannot agree.

In *Golub*, the trial judge asked the foreman what the numerical division was. The foreman responded that it was nine to three. The judge then said, "You ought not have any difficulty in reaching a verdict on this evidence." The supreme court found that this exchange, which did not reveal how the jury was divided, did not expressly or by implication indicate that the jury should reach a particular conclusion. "The remarks should not have been made, yet it cannot be said that they interfered with the deliberations of the jurors to the prejudice of [defendant] or that they hastened the verdict." *People v. Golub* (1929), 333 Ill. 554, 561.

In *Duszkewycz* the judge asked the foreman how the vote stood. He replied, "Eight-four, sir," without indicating how the jurors were divided. The judge then asked whether the jury could reach a verdict within an hour. The foreman replied negatively whereupon the judge sent the jury back to deliberate for one hour and told the jurors, "[S]ee if you can't reach a verdict." An hour later the jury was recalled and sent to dinner after which it continued deliberations. Later that night, after a further interval of unknown duration, the jury returned verdicts of guilty. (*People v. Duszkewycz* (1963), 27 Ill. 2d 257, 262.) As in *Golub*, the court found no evidence that the verdicts had been coerced.

■ Unlike *Golub* or *Duszkewycz* or any of the authorities cited by the State, there were a number of factors present in the case before us which, taken together, suggest that prejudicial error occurred. Twice the trial judge improperly asked for the numerical division of

[2]See generally Annot., 77 A.L.R. 3d 769 (1977).

the jury[3] and the second inquiry, which reflected an eleven to one split, was made after the judge already knew that the jury had divided eight to four in favor of returning a verdict of guilty; immediately after he first discovered that the jury was divided in favor of a verdict of guilty, the trial judge gave the jury a *Prim* instruction which, *inter alia*, urged the jurors to reach an agreement; on the fourth day of deliberations the jury was called into court three times at the insistence of the judge who repeatedly questioned the foreman regarding the state of deliberations; over the course of the deliberations the foreman indicated that the jury was deadlocked and that further deliberations might not help. By virtue of the trial court's actions in this case, the jury may well have believed that the court concurred with the majority and that deliberations would continue until a unanimous verdict of guilty was returned.[4] Such a verdict cannot be said to have been reached without improper prodding from the trial court and should not be allowed to stand. Accordingly, for these reasons and for those expressed in part II of this opinion, the judgment of the circuit court of Cook County is reversed and the cause is remanded for a new trial. In light of this disposition, it is unnecessary to address defendant's other contentions.

Reversed and remanded.

DOWNING and HARTMAN, JJ., concur.

---

[3]"Whenever the question of numerical division of a jury is asked from the bench, in the context of an inquiry into the progress of deliberation, it carries the improper suggestion that the state of numerical division reflects the stage of the deliberations. It has the doubly coercive effect of melting the resistance of the minority and freezing the determination of the majority." *People v. Wilson* (1973), 390 Mich. 689, 692, 213 N.W.2d 193, 195.

[4]"Most cases wherein adjuratory remarks of the court have been held coercive are those in which the court, either through its own questioning or through volunteered statements of jurors, has become informed not only as to the numerical division of the jury but also as to how many stand on each side of the ultimate issue of guilt. The urging of agreement in such circumstances of course creates in the jury the impression that the court, which has also heard the testimony in the case, agrees with the majority of the jurors. Coercion of the jurors in the minority clearly results." *People v. Carter* (1968), 68 Cal. 2d 810, 816, 442 P.2d 353, 357, 69 Cal. Rptr. 297, 301.