THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DONOVAN SIMS, Defendant-Appellant.

Third District   No. 3—92—0590

Opinion filed July 16, 1993.

Ronald S. Ellis, of Snyder, Sabuco, Aeschliman & Washburn, of Joliet (Roy A. Sabuco, of counsel), for appellant.

James Glasgow, State's Attorney, of Joliet (John X. Breslin and J. Paul Hoffmann, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LYTTON delivered the opinion of the court:

The defendant, Donovan Sims, was convicted of murder. On appeal, the defendant raises three issues: (a) whether the trial judge erred in admitting certain testimony of the State's firearms expert, (b) whether the prosecutor committed reversible error in closing argument, and (c) whether the trial judge erred in denying defendant's request that the jury receive an instruction on involuntary manslaughter. After considering the defendant's claims, we affirm the judgment below.

## I. FACTS

The defendant and two others were charged with the murder of

Ola Kelly. The cases were severed for trial, and the defendant's trial commenced on April 30, 1992.

Rene Medel testified that, at approximately 1 p.m. on October 13, 1991, he was driving an orange and white Blazer owned by his brother, Mauricio. Donnie Creal was a passenger. As Medel was driving in an area of Joliet known as "the Hill," he arrived at the intersection of California and Woodruff. He then observed a group of people wearing team jackets.

Medel testified that while he had never belonged to a gang, his brother had been a member of the Vice Lords. Two gangs, the Two-six and the Gangsters, were enemies of the Vice Lords. Medel stated that he didn't know the defendant, Donovan Sims. He did know Jermaine Ammons and Alex Mitchell and considered them to be his friends. Ammons and Mitchell were members of the Gangsters.

A short time later, as Medel approached the intersection of Woodruff and Fuller, someone in the middle of the street started shooting. Medel kept driving, but heard about 15 shots. It sounded like different guns were firing. One shot hit the Blazer, damaging the front windshield and dashboard.

Joliet police officer Cecile Gavin also testified. On October 13, 1991, she received a radio dispatch that shots were being fired in the area of Woodruff and Fuller. While proceeding to that location, she received a second dispatch and proceeded directly to a house at 1210 Fuller. In the living room was a woman, Ola Kelly, lying facedown. Gavin examined Kelly for a pulse but could not detect one. The paramedics arrived and turned Kelly over. Gavin saw blood on Kelly's gown and assisted in placing the woman on a stretcher. Gavin then went to the kitchen and found what appeared to be a bullet hole in the window. From this window, Gavin could see a vacant lot and the intersection of Woodruff and Fuller.

The State also called occurrence witnesses Levar Woods and Charles Williams. Both men testified that they were in the vicinity at the time of the shooting, and each stated that he knew Sims, Ammons and Mitchell. However, when asked where the three were located as the Blazer went by and the shooting occurred, Woods testified, "I do not know." When asked whether Sims, Ammons, and Mitchell ran after the shooting stopped, Woods replied, "I don't know." Similarly, Williams testified that he did not know where the defendant was at the time of the shooting, and Williams denied telling a Detective Stein that he saw the three men flee.

The State called Detective Thomas Stein as a witness. Pursuant to section 115—10.1 of the Code of Criminal Procedure of 1963 (Ill.

Rev. Stat. 1991, ch. 38, par. 115—10.1), the prosecution introduced evidence of prior inconsistent statements by Woods and Williams. Specifically, Stein testified that Woods had made and signed a written statement that he saw three subjects—Ammons, Mitchell and Sims—standing and firing upon the Blazer. In his statement, Woods said that Sims was standing in the grass to the east of 1112 Woodruff, and that Ammons and Mitchell were near a bush to the east of 1112 Woodruff. Woods saw Ammons and Mitchell flee, but did not know where Sims went. Also, Stein testified that Williams had made and signed a statement that he heard multiple shots being fired, and then observed Sims and the two other men flee.

Stein stated that he interviewed the defendant on December 3, 1991. According to Stein, the defendant stated that he, Williams, Woods, Mitchell and Ammons were standing around when the orange Blazer drove past their location. Sims then ran to a location where he had hidden a nine-millimeter gun, and positioned himself near the northeast corner of a residence. Mitchell and Ammons were armed with a .357 Python and a .45 automatic, respectively, and were positioned in an overgrown bushy area. When the Blazer returned, Sims opened fire and emptied his gun. The defendant believed that he had six rounds in the gun. The defendant then ran away. Sims told Stein that he had not intended to ambush the vehicle; rather, he armed himself for protection against Mauricio. Later that night, Sims spoke with Ammons on the telephone and learned that the police were looking for him. The defendant then went to Bloomington, Illinois, to hide from the authorities.

On cross-examination, Stein testified that Sims had told him that he believed the Blazer belonged to a member of a rival gang. Sims said that he ran and got his gun for protection. Sims thought that a door on the vehicle opened, and he thought that Mauricio was going to shoot. The defendant also stated that he was scared because Ola Kelly had been shot as a result of the shooting at the vehicle.

Another witness called by the prosecution was Walter Sherk, a firearm and tool mark examiner at the Illinois State Police Crime Laboratory in Joliet. After Sherk testified as to his education, experience and qualifications, the prosecutor moved that Sherk "be considered an expert witness." Defense counsel stated that he had no objection, and the prosecution was permitted to examine the witness.

Sherk testified that the bullet taken from Ola Kelly's body was a metal-piercing bullet, capable of being fired from a .38-caliber or .357-caliber weapon. He also testified that, in the past 16 years, he had fired thousands of bullets from semi-automatic weapons. Sherk testi-

fied that a shell casing would eject from a nine-millimeter gun at a distance of two to four feet; that a nine-millimeter bullet fired from a semi-automatic weapon could pass through the dashboard of a vehicle; that a nine-millimeter bullet fired from a semi-automatic weapon would travel a distance of one-quarter mile; and that a nine-millimeter bullet fired from a semi-automatic weapon could pass through a wall of a frame house about one-half block to one block away.

The defense rested without calling any witnesses. The jury found the defendant guilty, and he was sentenced to a 50-year term of incarceration in the Department of Corrections.

## II. ANALYSIS

### A. STATE'S EXPERT WITNESS

On appeal, the defendant argues that it was reversible error for the State's expert witness to testify regarding the distance a nine-millimeter shell casing would eject, the distance a nine-millimeter bullet could travel, and whether a nine-millimeter bullet could pass through a vehicle's dashboard or the wall of a frame house.

The defendant's argument appears to be somewhat inconsistent. He argues that the foregoing matters were outside the scope of any expertise which the witness may have possessed. However, the defendant also argues these matters are common knowledge and, therefore, no expert testimony was needed. After reviewing the record, we conclude that the trial judge did not err in admitting the testimony of the prosecution's expert witness.

The burden of establishing the qualifications of an alleged expert witness is upon the proponent of his testimony. The question of whether the proponent has met that burden is a matter within the discretion of the trial court. (*People v. Allison* (1992), 236 Ill. App. 3d 175, 189, 602 N.E.2d 1288.) Absent an abuse of that discretion, the ruling will not be disturbed on appeal. (*People v. Turner* (1993), 241 Ill. App. 3d 236, 245, 608 N.E.2d 906.) Only if the trial judge's error is "clear and prejudicial" will the appellate court reverse. *People v. Moody* (1990), 199 Ill. App. 3d 455, 462, 557 N.E.2d 335.

In this case, we find no abuse of discretion in allowing the testimony of the State's expert. Expert testimony is admissible when the subject matter of the inquiry is such that only persons of skill and experience in it are capable of forming a correct judgment as to any facts related to it. (*People v. White* (1993), 241 Ill. App. 3d 291, 300, 608 N.E.2d 1220.) A witness may be allowed to testify as an expert if his experience and qualifications give him knowledge not common to

lay persons and where such testimony will aid the trier of fact in reaching a conclusion. (*Turner*, 241 Ill. App. 3d at 244-45.) The indicia of expertise is not a given level of academic qualification, but whether the expert has knowledge and experience beyond the average citizen which would assist the jury in evaluating the evidence. Whether the specialized knowledge is acquired through education, training, experience, or a combination of each, the witness may testify if he possesses such knowledge. (*People v. Pollard* (1992), 225 Ill. App. 3d 970, 976, 589 N.E.2d 175.) Thus, an expert may be qualified on the basis of experience alone. (*Turner*, 241 Ill. App. 3d at 244.) In any event, a jury need not accept expert testimony to the exclusion of other evidence. It may reject the expert testimony if it considers other evidence more probative. *White*, 241 Ill. App. 3d 291.

■ Applying the foregoing authority to the case at bar, we conclude that the trial judge properly allowed the testimony of Walter Sherk. We do not accept the defendant's assertion that the average layman sitting on the jury would possess knowledge and experience regarding the distance and direction of shell casing ejections and the power of bullets.

The defendant's argument that Sherk lacked the requisite qualifications to testify about such matters is also without merit. Sherk held a degree in forensic science, received two years on-the-job training at the Illinois State Police Crime Laboratory in Joliet, and attended numerous courses and classes pertaining to firearms. For the past 16½ years, he had been employed as a firearm and tool mark examiner at the State laboratory. During that period, he had used guns similar to those involved in this case and fired thousands of rounds from such weapons.

### B. PROSECUTOR'S CLOSING ARGUMENT

Next, the defendant argues that three statements made by the prosecutor during closing argument constituted reversible error. We will address each of these comments in order.

First, the defendant challenges the prosecutor's statement:

> "The mental state required and the only mental state required is that he [the defendant] knew when he fired his gun at an occupied vehicle that created a strong probability of death or great bodily harm."

The defendant complains that this constituted an improper statement of the law inasmuch as the prosecutor failed to include the requirement that the killing be without lawful justification.

■ "Mental state" is a precise, technical term under Illinois law. Except for absolute liability offenses, each criminal offense must consist of both a voluntary act and a culpable mental state. (See Ill. Rev. Stat. 1991, ch. 38, pars. 4—1, 4—3.) In Illinois, the recognized mental states for various criminal offenses are "intent," "knowledge," "recklessness," and "negligence." (Ill. Rev. Stat. 1991, ch. 38, pars. 4—4, 4—5, 4—6, 4—7.) "Without lawful justification" is not a mental state.

After reviewing the record, we conclude that this comment did not prejudice the defendant's case by confusing the jury regarding the requirement that the killing be without lawful justification. Both counsel informed the jury that first degree murder required a finding of no lawful justification, and the trial judge properly instructed the jury as to this requirement.

Second, the defendant challenges the prosecutor's statement:

"If you find that he knew that shooting at the Blazer that he thought contained Mauricio Medel created a strong probability of death or great bodily harm when he pulled that trigger, then that is all you need."

The defendant again argues that this statement failed to advise the jury that, in order to convict the defendant of first degree murder, the jury would have to find the absence of lawful justification.

■ Placed in its proper context, however, the prosecutor's statement did not constitute error. After reviewing the record, we conclude that the challenged statement did not mislead the jury into believing that the prosecutor was listing the elements of the offense, or even the requisite mental state. This statement was made within the context of the prosecutor discussing the concept of transferred intent:

"Transferred intent means simply this, ladies and gentlemen: It doesn't matter if he [Sims] thought he was firing at Mauricio, that he was, in fact, firing at Rene [Medal] and Donnie Creal and that he killed Ola Kelly.

The intent, the knowledge for first degree murder, occurs at the time the trigger is pulled, and it flies with the bullet. It doesn't matter that Mauricio wasn't in that truck, and they missed Donnie and Rene, and that it was Ola Kelly that was killed.

The intent was formed at the moment that bullet was fired and [the] moment that each and every bullet was fired. That is transferred intent, ladies and gentlemen.

If you find that he knew that shooting at the Blazer that he thought contained Mauricio Medel created a strong probability

of death or great bodily harm when he pulled that trigger, then that is all you need.

Transferred intent says it doesn't matter that Mauricio wasn't in the—."

At that moment, defense counsel objected on the grounds that the State was also required to prove that the defendant acted without lawful justification. In spite of the fact that the trial court overruled the objection, the prosecutor immediately stated, "Ladies and gentlemen, what defense counsel states is correct. We also have to prove that this was without lawful justification." The prosecutor then resumed his comments regarding transferred intent.

Thus, read in context, the challenged statement occurred during the prosecutor's comments regarding a specific aspect of the case: transferred intent. And, once again, on numerous occasions, both counsel and the trial judge informed the jury that the prosecution had the burden of proving the absence of lawful justification.

Third, the defendant challenges the prosecutor's statement:

"We are confident that if you look at all the evidence, you will find that the People have proven the Defendant guilty of first degree murder, and that the defense has failed to meet their burden of proving that the Defendant believed he was acting in self-defense."

Here, the defendant argues that the prosecutor improperly attempted to shift the burden of proof to the defendant to show that he acted in self-defense.

Two points should be noted. First, it is clear from the record that, at the time that the prosecutor made the challenged statement, he was discussing the elements for second degree murder, urging the jury to reject the lesser offense and to convict the defendant of first degree murder. Second, the prosecutor did not state that the defendant had the burden of proving that he acted in self-defense. Rather, the prosecutor stated that the defendant failed to meet his burden of proving that the defendant *believed* he was acting in self-defense.

Section 9—2(c) of the Criminal Code of 1961 provides that a person is guilty of second degree murder when he commits first degree murder, and either of two mitigating factors is present. (Ill. Rev. Stat. 1991, ch. 38, par. 9—2(a).) The first mitigating factor is the presence of sudden and intense passion. (Ill. Rev. Stat. 1991, ch. 38, par. 9—2(a)(1).) The second mitigating factor is that, at the time of the killing, the defendant believed the circumstances to be such to legally justify or exonerate the killing, but the belief was unreasonable. Ill. Rev. Stat. 1991, ch. 38, par. 9—2(a)(2).

Section 9—2(c) also states, "the burden of proof is on the defendant to prove either factor by a preponderance of the evidence before the defendant can be found guilty of second degree murder." (Ill. Rev. Stat. 1991, ch. 38, par. 9—2(c).) However, when a defendant is on trial for first degree murder, and evidence of either mitigating factor has been presented, the burden remains on the State to prove the elements of first degree murder and, when appropriately raised, the absence of circumstances which would legally justify or exonerate the killing. Ill. Rev. Stat. 1991, ch. 38, par. 9—2(c).

"Under the present statute, which became effective July 1, 1987, the State still bears the burden to prove the elements of first degree murder; however, the defendant now bears the burden to prove, by a preponderance of the evidence, one of the factors in mitigation which must be present to reduce an offense of first degree murder to second degree murder." (*People v. Savickas* (1992), 230 Ill. App. 3d 322, 332, 594 N.E.2d 1233, citing *People v. Shumpert* (1989), 126 Ill. 2d 344, 351-52, 533 N.E.2d 1106.)

Thus, the prosecutor did not misstate the law when he said that the defense had the burden of proving that the defendant *believed* he was acting in self-defense.

### C. INVOLUNTARY MANSLAUGHTER INSTRUCTION

Finally, the defendant argues that the trial court erred in denying his request that the jury be instructed on involuntary manslaughter.

A defendant is entitled to an instruction consistent with his theory of his case if there exists evidence to support that theory. (*People v. Solis* (1991), 216 Ill. App. 3d 11, 18, 576 N.E.2d 120.) If there is even "the slightest amount of evidence in the record to justify an underlying theory," the instruction must be given. *People v. Garcia* (1988), 169 Ill. App. 3d 618, 620, 523 N.E.2d 992.

"The offenses of murder and involuntary manslaughter are distinguished only in terms of the mental state required. *** Murder requires the intent to kill or do great bodily harm or knowledge that the acts create a strong probability of such result while involuntary manslaughter requires only reckless conduct which causes death." *People v. Maldonado* (1992), 240 Ill. App. 3d 470, 481, 608 N.E.2d 499.

In this case, the defendant asserts that the jury should have been instructed on involuntary manslaughter since there existed some evidence that he acted in a reckless manner. When ascertaining whether or not a defendant's actions were reckless or intentional, courts examine the manner in which the defendant used his weapon. (*Solis*, 216

Ill. App. 3d at 18.) "A defendant's assertion that he did not intend to kill anyone is not a sufficient basis to warrant an involuntary manslaughter instruction where the defendant intended to fire a gun, pointed it, and shot in the victim's general direction." *Maldonado,* 240 Ill. App. 3d at 481.

In *People v. Santiago* (1982), 108 Ill. App. 3d 787, 439 N.E.2d 984, the defendant testified that he was returning to a party, when he observed a fight in the street. Several persons were swinging bats and sticks at his friends who were unarmed. One of the defendant's friends was clutching his throat and bleeding, and women were screaming. In response, the defendant obtained a pistol from a friend's car. The defendant testified that he fired three shots at a car's gas tank, trying to ignite it and create a diversion to break up the fight. One participant in the fight was shot and killed. Santiago was tried and convicted of voluntary manslaughter. *Santiago,* 108 Ill. App. 3d at 789-98.

On appeal, Santiago argued that the trial judge should have instructed the jury regarding involuntary manslaughter. In its response, the State relied upon cases where defendants had fired directly into crowds. (See *People v. DeMumbree* (1981), 98 Ill. App. 3d 22, 424 N.E.2d 73; *People v. Mitchell* (1973), 12 Ill. App. 3d 960, 299 N.E.2d 472.) The appellate court held that such an act was "significantly different from firing at an empty car with the intent of causing a diversion by possibly igniting the gas tank." (*Santiago,* 108 Ill. App. 3d at 803.) Accordingly, the court reversed Santiago's conviction on the ground that the defendant was entitled to an involuntary manslaughter instruction. *Santiago,* 108 Ill. App. 3d at 803.

In *People v. Maldonado* (1992), 240 Ill. App. 3d 470, 608 N.E.2d 499, two groups were engaged in a street fight. After the defendant fired one shot at his adversaries' station wagon, two men fled on foot and another began to drive the vehicle away. The defendant fired several more shots at the station wagon. One of the passengers was struck by a bullet and died. The defendant was tried and convicted of murder. *Maldonado,* 240 Ill. App. 3d at 473-74.

On appeal, the defendant argued that the trial judge erred in denying his request for an involuntary manslaughter conviction. In support of his contention, Maldonado cited the *Santiago* decision. The appellate court disagreed. Even if the defendant had only intended to scare the other people, as he claimed, the evidence indicated that this was accomplished when they began to flee after the first shot. Thereafter, Maldonado "fired into a moving vehicle," unlike *Santiago,* where "there was no evidence that anyone was in or near the car

when the defendant fired and the likelihood of injury or death was more remote since the car was unoccupied." (*Maldonado,* 240 Ill. App. 3d at 482.) Accordingly, the court held, the trial judge did not err in refusing to instruct the jury on involuntary manslaughter. *Maldonado,* 240 Ill. App. 3d at 482.

The present case is closer to the situation presented in *Maldonado* than *Santiago*. At the time that Sims and his accomplices opened fire on the van, the vehicle was moving. Thus, the defendant knew that the van was occupied, and he was firing at its occupants. Unlike *Santiago*, the defendant was not attempting to create a diversion. Moreover, it cannot be maintained that Sims believed that he was acting in self-defense. Although no one in the van fired a gun, or even displayed a weapon, Sims continued to fire until his gun was emptied. The defendant's actions could not be considered reckless.

■ Neither the fact that the bullet may have come from an accomplice's gun, nor the fact that the deceased was not the intended victim, affects our conclusion that the defendant was not entitled to have the jury instructed on involuntary manslaughter. Under the "common design rule," the State needed only to prove that the defendant had the specific intent to promote or facilitate a crime to hold the defendant accountable for any criminal act done in furtherance of the intended crime. (*People v. Gil* (1992), 240 Ill. App. 3d 151, 159, 608 N.E.2d 197.) Under the doctrine of "transferred intent," where the defendant shot at one person, with the intent to kill, but actually killed the other, he may be convicted of the crime of murder of the unintended victim. (*People v. Migliore* (1988), 170 Ill. App. 3d 581, 589, 525 N.E.2d 182.) The latter principle is embodied within the wording of the murder statute:

> "A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
>
> > (1) he either intends to kill or do great bodily harm to that individual *or another*, or knows that such acts will cause death to that individual *or another.*" (Emphasis added.)

(Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(1).)

The trial judge did not err in denying the defendant's request that the jury be instructed on involuntary manslaughter.

### III. Conclusion

We conclude that the trial judge properly allowed the testimony of the State's expert witness; that the prosecutor's statements during closing argument were proper; and that the trial judge did not err in

denying defendant's request for a jury instruction on involuntary manslaughter.

The judgment of the circuit court of Will County is hereby affirmed.

Affirmed.

SLATER and STOUDER, JJ., concur.