THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM CRADDOCK, Defendant-Appellant.

Fourth District   No. 4—86—0762

Opinion filed December 10, 1987.

1040

Daniel D. Yuhas and John J. Hanlon, both of State Appellate Defender's Office, of Springfield, for appellant.

Tim P. Olson, State's Attorney, of Jacksonville (Kenneth R. Boyle, Robert J. Biderman, and Linda Cullom, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCULLOUGH delivered the opinion of the court:

After a jury trial, defendant was convicted of unlawful delivery of a controlled substance (cocaine) and armed violence based upon the unlawful delivery of a controlled substance. (Ill. Rev. Stat. 1985, ch. 56½, par. 1401(a)(2); ch. 38, par. 33A—2.) Subsequently, the trial court sentenced defendant to 12 years' incarceration, imposed a street-value fine of $48,000, and a county fine of $7,000 on the unlawful delivery conviction. The trial court sentenced defendant to a concurrent term of 15 years' incarceration on the armed violence conviction.

Defendant appeals arguing: (1) the trial court coerced the jury's verdict by tendering a premature *Prim* (*People v. Prim* (1972), 53 Ill. 2d 62, 71-72, 289 N.E.2d 601, 607, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731) instruction and inquiring into its numerical division; (2) the prosecutor's questioning and closing argument were impermissible comments on defendant's post-arrest silence; (3) the unlawful delivery of a controlled substance conviction must be vacated; (4) the trial court erred in considering the presence of a weapon as an aggravating factor; and (5) defendant's sentence is grossly disparate to that of his codefendant.

We affirm the conviction and sentence for armed violence and vacate the conviction and sentence for unlawful delivery of a controlled substance.

Gerald Kempf, an undercover agent, testified that on February 2, 1984, he contacted a Pat Ryan by telephone to set up the purchase of cocaine. Ryan agreed to sell cocaine which was 80% to 85% pure at $2,000 an ounce. On February 6, Kempf again talked to Ryan but told Ryan he was running a few thousand dollars short of the purchase price. He asked if Ryan had the package and Ryan responded that he did. Kempf called Ryan again on February 9. They set up a meeting for the following day. Ryan told Kempf the package was ready and asked Kempf to call Ryan when he got into town. Kempf had ordered 1½ pounds of cocaine.

On February 10, 1984, Kempf and Ryan met at a restaurant. Kempf testified that he saw Ryan arrive in a small blue Honda. Someone was sitting in the back, passenger side seat of the Honda. No one else was in the car. While in the restaurant, Kempf and Ryan referred to the cocaine as diamonds because they were in a crowded area. Ryan asked Kempf to follow him. Kempf followed the vehicle to a shopping mall. Kempf asked if the person in the car was all right. Ryan responded he was. Ryan got out of the vehicle and removed a paper sack from its trunk. Kempf entered the vehicle on the

passenger side and sat with his back to the windshield. He was facing defendant.

Kempf introduced himself to defendant, who removed his right hand from his coat pocket and shook hands. Defendant was two to three feet away. He stated his name was Bill but did not otherwise speak. Ryan placed the paper sack between the bucket seats of the vehicle on the console. Kempf opened it, removed a cardboard box, turned it over, and opened it. Inside was a plastic bag containing a white powder. Kempf simulated tasting it and asked Ryan if it was the same cocaine as was contained in the sample. Ryan responded it was. Kempf told Ryan he would take the cocaine. They talked while in the car about whether he could make additional purchases of cocaine. Kempf arrested defendant and Ryan when they started to leave.

Michael Cravens, a forensic scientist, testified that the substance weighed 1½ pounds and tested positive for cocaine. He also tested the bowl of a spoon which was submitted for analysis. Cocaine residue was found in it.

Terry Wubker, an investigator with the Illinois Division of Criminal Investigations, testified that he observed defendant in the rear passenger seat of the Honda. He maintained a surveillance on the car until the signal to arrest its occupants. Kempf had Ryan in a search position when Wubker arrived. However, Wubker assisted in defendant's arrest. As Wubker searched defendant, he asked if defendant was carrying any weapons. Defendant responded that he was. Wubker removed a loaded .357 Magnum revolver from defendant's pocket. He also removed a small derringer from the same pocket. The derringer was loaded with hollow-point bullets, which explode on impact.

Wubker further testified that after he placed defendant in the squad car, defendant said this was what you got when you did a man a favor. Wubker read defendant's *Miranda* rights to him. Subsequently, defendant repeated this statement. Then, defendant said that they had talked about this and they had decided not to do it. He hoped that the transaction was on tape because it would show that he had nothing to do with it. The police would not find his fingerprints on anything. He then stated that he had tried to talk Ryan out of it. However, Ryan was afraid of being killed. Therefore, he came along for protection. At the jail, defendant asked Wubker why he had been handcuffed with his hands behind his back while Ryan had been handcuffed with his hands in front of him. He asked if Ryan had set him up to take the "fall." Wubker responded that he did not know.

Wubker further testified that defendant was concerned about the arrest. While Wubker was taking a history from him, defendant again stated that he hoped the transaction was on tape, his fingerprints were not on anything, and he hoped Ryan had not set him up because he was doing Ryan a favor. Defendant said he had let Ryan use his basement and the original wrappers for the "stuff" were in his boiler room. He suggested that the police promptly search the basement in order to recover the wrappers. Defendant also stated that Ryan wanted to use his scale. Defendant voluntarily agreed to a search.

Wubker stated that he participated in a search of defendant's home. He observed a large cardboard box with a large garbage bag in it. Inside were a brown sack, two plastic bags, and a box which had been cut open. All of the items appeared to be contaminated with a white powdery substance.

Officer Rick Avart, a member of the Illinois Division of Criminal Investigations, testified that in searching the basement, he found a pair of rubber gloves in the trash. He also located a scale which appeared to have a powdery residue on the pad. A spoon next to the scale also had a powdery residue on it.

Defendant testified that he and Ryan had been friends since high school. Defendant dealt in precious metals. The scale was used to weigh the metals. A few months prior to the arrest, he had consigned to Ryan a 17-carat diamond ring. Ryan stated that he knew a person who would buy the ring for $20,000. However, the ring disappeared. Ryan "ran him around" about the ring for some months. On February 10, Ryan came to defendant's house at approximately 9:30 a.m. and said he needed a safe telephone to make some phone calls in order to get the ring back. Defendant gave him the key to the storage room. Defendant stated he had no idea that Ryan was going to use his scale. He assumed there needed to be arrangements to call someone in Canada. He and John Kolberer were cleaning the yard. After a few moments he became nervous, and went into the basement. He saw Ryan put what appeared to be a white powder into a gym bag. He then asked Ryan what he was doing. Ryan responded that he had to do a deal in order to expedite business. Defendant stated he tried to talk Ryan out of the project and asked him to take his materials and leave. Ryan did so.

At approximately 2:30 p.m., Ryan returned telling defendant that he thought he could get the ring back. However, he was afraid to go by himself. Defendant believed he and Ryan were going to see people who had the ring in their possession. Ryan and he did not discuss co-

caine. He realized that the situation was bad when Ryan walked back to the trunk and got a package out of the car. However, he did not learn there was cocaine until the arrest. He denied seeing the package other than outside of the vehicle. He stated that Kempf and Ryan held it low. He never actually saw the cocaine, and was in shock when he realized that something illegal was going on.

Defendant further stated that he had carried a gun since 1979. He needed the protection in connection with his business and had been threatened earlier that year. On cross-examination, defendant's testimony was impeached by prior testimony. The prosecutor's last question to defendant was whether he said anything at the time of the arrest about the transaction being over his ring to Wubker. Defendant responded that he didn't remember mentioning diamonds to Officer Wubker. Defense counsel did not object to this question.

The jury retired at 4:03 p.m. The record does not show whether the jury took a break for dinner. At approximately 9 p.m., the court recalled the jury and questioned its foreman. He asked the foreman to tell him what the latest vote was without indicating who it favored. The foreman responded that it had been 11 to 1. The court then asked how long the jury had been in that position. The foreman responded for approximately one hour. The court then asked whether there was any chance of progress within the next two hours. The foreman stated that he was not certain. The foreman stated he believed the jury was getting "a little weary" that evening. The court then stated:

> "Ladies and gentlemen, it's such an important case and you're so close, and I don't know which way you may favor. I would like to see you conclude your work this evening. I'm addressing my remarks to all of you. Again, I don't want to wear you out, and I understand the limitations of your ability to apply yourself. And you may be approaching that in the next hour or two. Even though you are tired now, you can certainly be more tired then.
>
> There is one option that the Court can give you an instruction, which the Court may do at this time. The additional instruction would entail that you then go back to reconsider various viewpoints. Another option is that the Court can ask you to return tomorrow, but that has certain risks inherent in it that we might lose a juror between now and tomorrow due to illness or various other problems, and that might cause a mistrial. Views change overnight, and rather than have eleven to one you might have ten-two or something different in the

morning. And so I think it's timely, ladies and gentlemen, that you apply yourselves. And I'm going to give you this additional instruction that may help you in that regard."

The court then gave the jurors a *Prim* instruction. The jury resumed its deliberations at 9:07 p.m. Subsequently, it returned guilty verdicts on both counts. The record does not state the exact time at which the jury returned the verdicts.

After the court had entered judgment on the verdicts, defense counsel asserted a bailiff had stated in the presence of the judge, the court reporter, and the State's Attorney that he had told the jury that if they could not reach a verdict, the court was going to send them home and recall them in the morning. The incident was not reported by the court reporter.

Subsequently, defense counsel, in a post-trial motion, alleged an improper communication by the bailiff to the jury. The motion alleged the bailiff told the jury that unless they could reach a verdict soon, the court would send them home for the night and require them to return the next morning. Defendant argued this caused a hasty verdict. On September 23, 1984, defense counsel orally moved to strike this paragraph from his post-trial motion. He stated that he had considered it and determined that it would not prevail. At the hearing on the motion, defense counsel requested leave to reinstate the paragraph.

Defendant argues the trial court's comments, premature tendering of the *Prim* instruction, and inquiry into the numerical division of the jury, when coupled with the bailiff's comments, coerced the verdict. We disagree. Initially, we note the trial lasted two days. In reviewing the propriety of the trial court's comments and supplemental instruction, the test is whether the language used actually interfered with or coerced the verdict to the prejudice of the defendant. (*People v. Branch* (1984), 123 Ill. App. 3d 245, 462 N.E.2d 868.) The timing of a supplemental instruction is discretionary with the trial court (*People v. Cowan* (1985), 105 Ill. 2d 324, 473 N.E.2d 1307). A *Prim* instruction may be given to a jury which is not in fact deadlocked (*People v. Griggs* (1984), 126 Ill. App. 3d 477, 467 N.E.2d 397), and is considered less coercive in that case (*People v. Plantinga* (1985), 132 Ill. App. 3d 512, 477 N.E.2d 1299). While it is error for a court to inquire into the numerical division of the jury, the error is harmless if it does not interfere with the verdict. (*People v. Green* (1980), 91 Ill. App. 3d 1085, 415 N.E.2d 595.) Informing a jury that it will be sequestered after a certain time is also not necessarily coercive. *People v. Friedman* (1986), 144 Ill. App. 3d 895, 494 N.E.2d

760; *People v. Baggett* (1983), 115 Ill. App. 3d 924, 450 N.E.2d 913, *cert. denied* (1984), 465 U.S. 1032, 79 L. Ed. 2d 698, 104 S. Ct. 1298.

Defendant does not contest the propriety of the *Prim* instruction. That instruction precisely paralleled the instruction given in the *Prim* case. Here, defendant argues the court's comments about bringing the jury back the next day caused a hasty verdict. The trial court expressed a concern that the jury was tired. It was 9 p.m. By informing them that deliberations could continue the next day, the trial judge removed any concern that a verdict would have to be reached that evening.

■ Concerning the judge's comments and questions, he did not know which verdict the jury favored. His language was noncoercive in nature. Any error in inquiring into the numerical division of the jury was harmless. (*People v. Green* (1980), 91 Ill. App. 3d 1085, 415 N.E.2d 595.) The questions utilized by the trial court paralleled those suggested in the Illinois benchbook for trial judges. (R. Mills, R. Fitzgerald, R. Burns, & L. Bolon, Bench Book for Illinois Trial Judges, ch. 8, §3 (2d ed. 1978), Ill. Judicial Conference Committee on Criminal Law for Illinois.) This manual indicates the trial judge may inquire into the numerical division of the jury as long as he does not ask which verdict the jury favors. Inquiry into the numerical division of the jury is error. (*People v. Duszkewycz* (1963), 27 Ill. 2d 257, 189 N.E.2d 299.) It is reversible error if it interferes with the jury verdict to the prejudice of the defendant. (*People v. Green* (1980), 91 Ill. App. 3d 1085, 415 N.E.2d 595.) In the instant case, the trial court did not know which verdict the jury favored, and defendant did not establish any prejudice. Circumstances could arise where such an inquiry, taken with other statements by the trial court, would not be harmless error. As stated, the error was harmless.

The bailiff's alleged comments are not in the record. Defendant waives review of an issue if the record is inadequate to resolve it. We note, however, that if counsel's statement was correct, the bailiff was merely repeating what the trial court had previously stated to the jury. No error occurred.

Defendant argues he was denied a fair trial, alleging the prosecutor questioned him about his post-arrest silence and commented on that silence in closing argument. Defendant did not object to the question or raise this issue in his post-trial motion. Ordinarily, this waives review of the alleged error. (*People v. Friesland* (1985), 109 Ill. 2d 369, 488 N.E.2d 261; *People v. Burns* (1986), 144 Ill. App. 3d 345, 494 N.E.2d 872.) However, a comment on post-arrest silence af-

fects a defendant's substantial rights. (*People v. Green* (1979), 74 Ill. 2d 444, 386 N.E.2d 272; *People v. Nolan* (1987), 152 Ill. App. 3d 260, 504 N.E.2d 205.) Therefore, we will address the merits of the instant issue.

■ A defendant's post-arrest silence may not be used to impeach an exculpatory story told for the first time at trial. (*Doyle v. Ohio* (1976), 426 U.S. 610, 617-18, 49 L. Ed. 2d 91, 97-98, 96 S. Ct. 2240, 2244-45.) Silence after *Miranda* warnings may be nothing more than the exercise of the right to be silent. Therefore, it is ambiguous; thus, it is fundamentally unfair to allow use of such silence as impeachment of an explanation offered at trial. See also *People v. Smith* (1987), 157 Ill. App. 3d 465, 510 N.E.2d 515.

In *Anderson v. Charles* (1980), 447 U.S. 404, 65 L. Ed. 2d 222, 100 S. Ct. 2180, the Court held that *Doyle* was not violated where the defendant was not silent but made a statement. The defendant's post-arrest statement and trial testimony must be manifestly inconsistent before the prosecutor is permitted to comment on the post-arrest statement. *People v. Beller* (1979), 74 Ill. 2d 514, 386 N.E.2d 857; *People v. Smith* (1987), 157 Ill. App. 3d 465, 510 N.E.2d 515.

■ Defendant's post-arrest statements in the instant case were manifestly inconsistent with his trial testimony. Therefore, the prosecutor properly inquired about the prior inconsistent statement. After arrest, defendant stated that he hoped the transaction was tape-recorded as the recording would show he had not participated. He also stated the police would not find his fingerprints on anything and he had merely come to protect Ryan, who was afraid of being killed. Later, defendant asked whether Ryan blamed him for the incident. Defendant noted arrest was what happened when you did a friend a favor.

At trial, defendant testified he accompanied Ryan to recover defendant's ring. Although defendant knew Ryan had used his basement to package the cocaine, defendant thought they were recovering his ring. The prosecutor asked whether defendant had told the police about the ring. Defendant said he had not. Defendant's post-arrest statements indicate that he realized that he was participating in a drug sale. The prosecutor could, therefore, inquire into the inconsistency of the post-arrest statement and trial testimony. At trial, defendant stated that he believed he was participating in a legal act. *Anderson v. Charles* (1980), 447 U.S. 404, 65 L. Ed. 2d 222, 100 S. Ct. 2180; *People v. Graves* (1986), 142 Ill. App. 3d 885, 492 N.E.2d 517.

■ Defendant next argues that his conviction and sentence for

unlawful delivery of a controlled substance must be vacated. We agree. Multiple convictions for armed violence and the underlying felony cannot stand where a single act is the basis of both charges. (*People v. Payne* (1983), 98 Ill. 2d 45, 456 N.E.2d 44, *cert. denied* (1984), 465 U.S. 1036, 79 L. Ed. 2d 708, 104 S. Ct. 1310; *People v. Donaldson* (1982), 91 Ill. 2d 164, 435 N.E.2d 477; *People v. Arnett* (1985), 139 Ill. App. 3d 342, 487 N.E.2d 747.) However, remand for a new sentencing determination is unnecessary where separate sentences were entered on each count. (*People v. Donaldson* (1982), 91 Ill. 2d 164, 435 N.E.2d 477.) Here, the unlawful delivery conviction was the predicate offense for the armed violence conviction. It must thus be vacated.

The State urges this court to shift the fines imposed as a part of the sentence on the unlawful delivery conviction to the sentence on the armed violence conviction, and affirm them. A street-value fine is a mandatory part of a sentence for an accused convicted of certain drug-related offenses. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—9—1.1.) The trial court correctly entered the fine as a part of the sentence for the unlawful delivery conviction. This court will not increase defendant's sentence on the armed violence conviction by adding the street-value fine and the county fine to it.

Defendant argues the court abused its sentencing discretion by considering the presence of weapons as an aggravating factor to armed violence. Defendant did not object on this basis at the sentencing hearing. He did not raise this issue in his motion for reconsideration of sentence. Defendant waived review of the issue. *People v. Killings* (1986), 150 Ill. App. 3d 900, 501 N.E.2d 1363; *People v. Moffitt* (1985), 138 Ill. App. 3d 106, 485 N.E.2d 513.

We note, however, that no error occurred. To the extent that an aggravating factor is inherent in the offense, it may not be used to enhance the sentence. (*People v. Conover* (1981), 84 Ill. 2d 400, 419 N.E.2d 906; *People v. Rhodes* (1986), 141 Ill. App. 3d 362, 490 N.E.2d 169.) Before an aggravating factor may properly be considered in sentencing, its risk must be greater than that inherent in the offense. *People v. Allen* (1981), 97 Ill. App. 3d 38, 422 N.E.2d 254.

Under the circumstances presented here, the trial court properly considered the presence of a weapon as an aggravating factor. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2.) Defendant carried two concealed weapons. The court focused upon the type of bullets used in one of the weapons. The bullets were designed to explode upon impact. The court also considered that the defendant was present to use or threaten to use the weapons if necessary during the transac-

tion. These factors pose additional harm not inherent in the commission of a felony while armed with a weapon. They were properly considered. *People v. Saldivar* (1986), 113 Ill. 2d 256, 497 N.E.2d 1138.

Defendant next argues the cause must be remanded for resentencing because his sentence was grossly disparate to Ryan's sentence. Ryan was sentenced to a six-year term of imprisonment after a negotiated plea of guilty to unlawful delivery of a controlled substance. Arbitrary and unreasonable disparity between the sentences of similarly situated codefendants is impermissible. However, a disparity will not be disturbed where it is warranted by the nature and extent of defendant's participation in the offense or by a difference in criminal records. (*People v. Bergman* (1984), 121 Ill. App. 3d 100, 458 N.E.2d 1370.) The disparity is warranted in the instant case. Defendant carried the weapons and thus increased the potential for violence in the transaction. The trial court could properly discount his statement that Ryan facilitated the offense. Additionally, defendant had a prior narcotics conviction, which Ryan did not have.

For the above reasons, we vacate the conviction and sentence for unlawful delivery of a controlled substance and affirm the conviction and sentence for armed violence.

Affirmed in part and vacated in part.

KNECHT and SPITZ, JJ., concur.