THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WESLEY KING, Defendant-Appellant.

First District (1st Division)   No. 1—88—3082

Opinion filed August 2, 1993.—Rehearing denied October 13, 1993.

Randolph N. Stone, Public Defender, of Chicago (Elyse Krug Miller, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Veronica X. Calderon, and Gregory Vaci, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant Wesley King was found guilty of the murder of decedent Stevon Draine. Defendant was tried jointly with codefendant Allen Williams, who was acquitted of all charges. Defendant was sentenced to 20 years in the Department of Corrections and now appeals.

The record on appeal indicates the following facts. Before trial, defendant filed a motion to sever, alleging that codefendant had given the police a statement implicating defendant and that their defenses were antagonistic. After hearing argument, the trial court denied the motion. The trial court also denied defendant's motion *in limine* to prevent the State from referring to gang activity or membership.

At trial, Donald Jackson, a/k/a "Rico," testified for the State. Rico testified that on May 31, 1987, he and decedent were members of the Disciples street gang. Rico testified that there was "bad blood" between the Disciples and a gang known as the Vice Lords. Rico had been in altercations with the Vice Lords. Rico stated that he had known codefendant for seven years and defendant for two years. According to Rico, codefendant had been a member of the Vice Lords, but was not a member on May 31, 1987. Rico further stated that in the two years he had known defendant, he had only seen defendant in the company of Vice Lords. Rico testified that defendant was a member of the Vice Lords, but defendant's objection to this testimony was sustained for lack of foundation.

Rico testified that at approximately midnight on May 31, 1987, he, decedent, Monique Chambers and Anita Trammel were walking toward Rico's apartment at 72nd Street and Phillip Avenue. Codefendant was standing in front of a building the four passed along the way. Codefendant asked Rico whether Rico had $25 which Rico had borrowed from codefendant. Rico said that he did not; codefendant told Rico to get the money to him when Rico got it. According to Rico, decedent then said to Rico, "Fuck them pussy ass Hooks." Rico testified that "Hooks" was a term used to refer to Vice Lords.

After these remarks, Rico, decedent, Chambers and Trammel continued to walk south towards Rico's apartment. Codefendant asked what decedent said and asked decedent to come back. Decedent said, "Pussy motherfucker, you heard what I said, I ain't biting my

tongue." At this point, decedent and codefendant were approximately a foot and a half apart from each other. Rico testified that codefendant pushed decedent in the face; decedent then hit codefendant three or four times in the face.

The two women continued walking south towards Phillips Avenue. According to Rico, approximately 16 men came out of codefendant's building to watch the fight. Rico testified that these men were "affiliated," but the trial court sustained a defense objection to testimony that they were affiliated with defendant. One of these men was named Robert Butler. During the fight, Rico saw defendant holding an aluminum baseball bat propped on his shoulder in a batting position. Rico warned defendant that if he hit anyone with the bat, he would not hit anyone else. Rico and Butler stopped the fight.

Rico told decedent that there were too many people and that he and decedent could come back tomorrow. Rico stated that decedent began to realize what Rico was saying. Rico and decedent began to walk away and caught up with Chambers and Trammel. Rico and Trammell were a bit in front of decedent and Chambers. Rico testified that he heard a gunshot; decedent fell to the ground.

Rico further testified that as he heard another shot, he looked back to see defendant holding a gun in his outstretched arm. Rico stated that he also saw codefendant coming from around the corner of the building where codefendant lived. Rico told the two women to find the police; the women ran from the scene.

Rico then testified that he ran back toward 72nd Street, where he saw his cousin driving down the street. Rico stopped his cousin and told him that decedent had been shot. Rico, his cousin and Peter Butler then loaded decedent into the automobile. Rico and his cousin drove to decedent's home to inform decedent's family of the shooting. Family members went with Rico and his cousin to take decedent to the hospital.

Rico admitted that he had a prior conviction for burglary and that the State had agreed to reduce a pending charge of residential burglary to theft in return for a guilty plea, so that Rico would receive a sentence of probation, rather than incarceration. Rico testified that he was afraid to go to prison because he believed he would be killed by Vice Lords there, but the testimony was stricken after defense objections to it were sustained. Rico stated that he told defense counsel before trial that he did not see the shooting because anything he said could and would be used against him, not just in a court of law, but on the street. Rico explained that he meant that he could face retalia-

tion for his testimony, but defense counsel's objection to this last statement was sustained and it was stricken.

Rico testified that he and decedent got along with codefendant, though they were in a rival gang. Rico testified that after the fight, he saw codefendant go around the corner onto 72nd Street and could not see defendant or codefendant enter any apartment.

Rico denied having told a police officer that he was not with decedent on the night of the shooting. Rico admitted that in an interview with defense counsel and another man, he told defense counsel that someone other than defendant was the shooter. Rico was asked whether he had told defense counsel that if called as a witness, he might lie or he might tell the truth. Rico responded as follows:

> "No. I told him that if I was called, I would tell him the truth. I told him—I told him that. I told—I told, you know, you know I told him a story, you know. That is what I told him. I told you, if they do call me, I will tell the truth, I am not going to—."

At this point, Rico's testimony was cut off by other questions.

Monique Chambers testified that on the night at issue, she and Trammel were walking with decedent and Rico to Rico's apartment. She testified that they passed codefendant's apartment building where codefendant was standing on the porch. According to Chambers, codefendant yelled "Rico, where's my 2-5." Codefendant and Rico had a short talk, after which the four continued walking down Phillips Avenue.

Chambers testified that defendant, codefendant and others came around to the side of the building. Codefendant yelled "Bring your punk ass back here." Decedent walked back toward codefendant; Rico, Chambers and Trammel followed. Decedent and codefendant exchanged words and began fighting. Defendant stood nearby with a baseball bat. According to Chambers, one of the others had given the bat to defendant, telling him to "bust that punk motherfuck with it." Chambers saw defendant with the bat in a downward position.

Chambers testified that after the fight, she saw defendant and codefendant walk back around to the front of codefendant's building. Chambers did not see either man enter the building. She, Trammel, Rico and decedent started walking away. Chambers heard a single gunshot. Decedent fell to the ground, shot in the back of the head. Chambers testified that she and Trammel ran to the corner of 73rd Street and Exchange Street, where they stopped a police car. Chambers told the police that decedent was shot and that "Wesley did it."

The police took Chambers and Trammel back to the scene of the shooting, where they saw Rico and decedent in a car. Chambers also saw defendant and identified him to the police. Defendant was then apprehended.

At the police station, Chambers told police that she heard a gunshot, turned around and saw defendant with a gun in his hand. According to Chambers, she told Detective Carey that she heard a shot and saw fire coming out of the gun as decedent fell to the ground. Chambers denied telling the police that she saw defendant and codefendant come out of the building after the fight and that defendant had a gun in his hand at that time. On cross-examination, Chambers testified that she did not see who fired the shot and did not see defendant with a gun.

Chicago police detective George Carey testified that on the night in question, he was assigned to decedent's shooting. At about 2:30 a.m., Detective Carey spoke with Chambers at Area One headquarters. According to Detective Carey, Chambers told him that after the fight between decedent and codefendant, she saw defendant and codefendant walk into the building at the corner of 72nd Street and Phillips Avenue. Detective Carey testified that Chambers told him that as she and decedent began walking arm in arm toward 73rd Street, she saw defendant and codefendant come back out of the building and that defendant had a gun in his hand. Chambers told Detective Carey that she heard a shot, saw flame come out of the barrel of the gun and saw decedent fall to the ground. She also told Detective Carey that she flagged down a police car and pointed out defendant and another individual to the police, both of whom were arrested at that time.

Detective Carey also testified that at 5 a.m., he searched codefendant's apartment, where the police recovered a baseball bat. According to Detective Carey, codefendant identified the bat as the one defendant held during the fight. The trial court instructed the jury that codefendant's statement could not be used against defendant.

Doctor Nancy Jones, a deputy medical examiner, testified that an examination of decedent indicated that his death was caused by the gunshot to the back of the head.

Chicago police officer Milan Hrebenak testified that on the night in question, he and his partner were driving north on Exchange Avenue when they heard screaming. They turned and approached a crowd of people. According to Officer Hrebenak, two young black girls told him that decedent had been shot by defendant. The police proceeded to 72nd and Phillips, where Officer Hrebenak saw a car with a person

lying down in the back seat. Officer Hrebenak testified that Chambers pointed to two men on the scene and identified defendant by name. Defendant was arrested. The State rested its case in chief.

Donald Hindman testified that he worked for the Cook County public defender's office on July 19, 1988, when he spoke with Rico. Hindman testified that Rico identified a man other than defendant as the shooter on the night in question.

Another employee of the Cook County public defender's office, Albert Krawczyk, testified that he spoke with Rico on August 16, 1988. Krawczyk was asked what Rico said he intended to do if called as a witness in this case. The State's objection to such testimony as being hearsay and nonimpeaching was sustained.

Robert Butler testified that he saw the fight on the night in question. Butler testified that after the fight, he and defendant were walking away from the area when he heard a shot fired. According to Butler, defendant did not have a gun in his hand at the time. Butler further testified that he and defendant then ran around the corner to see decedent on the ground. Butler helped put decedent into a car to be taken to the hospital.

Codefendant testified that he got into a shoving match with decedent on the night in question. Codefendant testified that he was on the porch of his building when decedent was shot. After hearing the gunshot, codefendant ran around the corner to see decedent on the ground. On cross-examination, codefendant denied telling the police that he had searched defendant after seeing defendant rounding the corner of the building, but did not find a gun.

Following closing arguments and jury deliberations, defendant was found guilty of murder and sentenced to 20 years in prison. Defendant now appeals.

## I

Initially, defendant argues that he was denied a fair trial because the trial court denied his severance motion. Generally, defendants jointly indicted are to be jointly tried unless fairness to one of the defendants requires a separate trial to avoid prejudice. (*People v. Byron* (1987), 116 Ill. 2d 81, 92, 506 N.E.2d 1247, 1251.) There are two common forms of prejudice in this regard. First, a nontestifying codefendant may have made out-of-court admissions that implicate the defendant. Introduction of such statements into evidence, even if the jury is given limiting instructions not to consider them against the defendant, can violate the latter's sixth amendment right of confrontation. (*People v. Daugherty* (1984), 102 Ill. 2d 533, 541-42, 468

N.E.2d 969, 973, citing *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.) Second, the defendants may present defenses that are so antagonistic that it is unfair to try them together. (*E.g., People v. Bean* (1985), 109 Ill. 2d 80, 93, 485 N.E.2d 349, 355.) The decision to deny a motion for severance is reviewed under an abuse of discretion standard, based on the information the trial court had at the time the motion was made. *People v. Lee* (1981), 87 Ill. 2d 182, 186, 429 N.E.2d 461, 463.

■ As to the first type of prejudice, the confrontation clause is not violated by the admission of a codefendant's statement where the codefendant testifies at trial and is subject to full and effective cross-examination. (*Nelson v. O'Neil* (1971), 402 U.S. 622, 29 L. Ed. 2d 222, 91 S. Ct. 1723; see *People v. Jones* (1988), 169 Ill. App. 3d 883, 897-98, 524 N.E.2d 593, 602.) Where a codefendant takes the stand in his own defense and denies making an alleged out-of-court statement implicating the defendant, the defendant has been denied no rights protected by the sixth and fourteenth amendments. See *People v. Coleman* (1991), 223 Ill. App. 3d 975, 991 n.1, 586 N.E.2d 270, 281 n.1, *appeal granted* (1992), 145 Ill. 2d 637, 596 N.E.2d 632.

In this case, the trial court determined that defendant had failed to show the requisite degree of antagonism between the defenses. This determination is borne out by the record on appeal. Codefendant testified in his own defense and was subject to full and effective cross-examination. Codefendant did not assert that defendant was the shooter and denied telling the police that he had searched defendant for a gun after the shooting. Defendant also had argued that the defenses were antagonistic because codefendant intended to introduce the results of his gunshot residue test (which were negative), but defendant was not going to introduce the results of his gunshot residue test (which were inconclusive). However, the introduction of codefendant's test results neither implicated defendant nor rendered the defenses so antagonistic that severance was required in this case. Accordingly, defendant has failed to show that the trial court abused its discretion in denying the severance motion.

II

Defendant next argues that he was denied a fair trial because the State introduced irrelevant testimony that he and others were involved in street gangs to prove a motive for the commission of the crime. Evidence of gang affiliation is admissible if it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial impact. (See *People v. Gonzalez* (1991), 142 Ill. 2d

481, 487, 568 N.E.2d 864, 866-67.) Generally, evidence that a defendant was a member of a gang or was involved in gang-related activity may be introduced to show common purpose or design, or to provide a motive for an otherwise inexplicable act. (*People v. Smith* (1990), 141 Ill. 2d 40, 58, 565 N.E.2d 900, 907.) Such evidence may also be relevant as part of the narrative describing the events which led to the defendant's identification or arrest. (*Gonzalez*, 142 Ill. 2d at 488, 568 N.E.2d at 867.) Nevertheless, the State cannot impute a gang-related motive to a defendant simply because he had been seen with a known gang member. (See *Smith*, 141 Ill. 2d at 58-59, 565 N.E.2d at 907-08.) Evidence of gang membership or activity must be related to the crime charged to be admissible. See *Smith*, 141 Ill. 2d at 58, 565 N.E.2d at 907.

■ In this case, the record shows that decedent was shot while leaving the scene of an altercation between decedent and codefendant. The record shows that this altercation appears to have been occasioned by a remark decedent made that showed hostility toward "Hooks." The record shows that decedent made the remark at the end of a conversation between Rico and codefendant regarding a debt. In order to understand the chain of events leading up to the shooting, evidence that Rico and decedent were members of the Disciples, codefendant was a former member of the Vice Lords and that there was "bad blood" between the two gangs was relevant and admissible.

Defendant, however, focuses upon the State's theory of the case, which was that defendant was a Vice Lord who shot decedent at the behest of codefendant, who was a former Vice Lord. Defendant notes that Rico's testimony as to defendant's gang affiliation and the affiliation of the 15 or 16 men who came out of codefendant's building was stricken for lack of foundation. Relying upon *Smith*, defendant argues that the State could not argue that he was a Vice Lord based solely on Rico's testimony that Rico had seen defendant in the company of Vice Lords. Defendant thus concludes that the State's opening and closing arguments, which identified defendant and others as Vice Lords, combined with the eliciting of testimony (ultimately stricken) to this effect, denied defendant a fair trial.

Initially, we must note that on the occasions when defense counsel objected to such argument or testimony, the trial court often sustained the objection and instructed the jury to disregard it, thus curing any error. On other occasions, defendant failed to contemporaneously object to argument regarding gang affiliation, thus waiving some of the objections raised here. Nevertheless, the trial court over-

ruled some of defendant's objections to argument regarding gang affiliation. Consequently, we address the issue as a whole.

The State is permitted to outline in an opening statement what it expects the evidence will show, but cannot argue that which the State does not expect to prove. Even so, reversal is not required simply because an opening statement refers to evidence which later proves to be inadmissible. Reversible error occurs only in cases of deliberate misconduct by the State that causes substantial prejudice to the defendant's rights. *Smith*, 141 Ill. 2d at 63-64, 565 N.E.2d at 910.

In this case, the record contains a transcript of a hearing on defendant's motion *in limine* to exclude evidence of gang affiliation. The record indicates that the State intended to prove the matters to which defendant objects through Rico's testimony. The record further indicates that the trial court later struck portions of Rico's testimony regarding gang affiliation as lacking a foundation. Defendant has failed to show from this record deliberate misconduct on the part of the State.

As for closing argument, the State is permitted great latitude to argue to the jury facts and legitimate inferences that may be drawn from the evidence. Conversely, the State is not permitted to argue assumptions or facts not based upon the evidence. However, improper argument will not merit reversal unless it results in substantial prejudice to the defendant. *Smith*, 141 Ill. 2d at 60, 565 N.E.2d at 908.

In this case, the State argued that defendant and the men who came out of codefendant's apartment during the fight were Vice Lords. The record shows that Rico's testimony that defendant was a Vice Lord and that the men from codefendant's apartment were affiliated with defendant was stricken. It was therefore improper for the State to make these arguments.

The question of whether the arguments were reversible error is another matter. Defendant relies upon *Smith*, in which our supreme court held that the State could not prove a gang-related motive from testimony that defendant had been seen on two occasions in the presence of an alleged gang leader. (*Smith*, 141 Ill. 2d at 59, 565 N.E.2d at 907-08.) We note that nothing in the *Smith* opinion suggests that the persons who saw the defendant in the presence of the alleged gang leader had any personal knowledge of whether the defendant was a gang member. This court has previously held that nonexpert testimony of gang membership or affiliation is admissible where the background testimony lays the necessary foundation. (*People v. Wadley* (1988), 169 Ill. App. 3d 1036, 1044, 523 N.E.2d 1249, 1255.) In *Wadley*, the nonexpert police officer was a member of the gang

crimes unit, which gave him background of gang culture, and became familiar with defendant during an investigation of another offense. *Wadley*, 169 Ill. App. 3d at 1040-41, 523 N.E.2d at 1255.

In this case, Rico was closer to the witness in *Wadley* than the witnesses in *Smith*. Rico testified that he was a member of the Disciples, which gives him a background in gang culture. Indeed, there was no objection to Rico's testimony that he and decedent were both Disciples and that there was bad blood between the Disciples and the Vice Lords. Nor was there any objection to Rico's testimony that he had been in altercations with the Vice Lords. Rico's experience as a Disciple, including altercations with the Vice Lords, indicates that Rico had personal knowledge of whether defendant and others were members of the Vice Lords. Moreover, unlike *Smith*, Rico testified that he had known defendant for two years and *only* saw defendant in the company of the Vice Lords. The State's problem in this case was that this testimony was not put together as a coherent foundation for testimony as to gang affiliation. However, the record viewed as a whole indicates that defendant was not substantially prejudiced by argument and testimony that defendant and the men who came out of codefendant's building during the fight were Vice Lords or affiliated with the Vice Lords.

### III

■ Defendant contends that he was denied a fair trial because the State made other improper comments in closing argument, in addition to those regarding gang affiliation. For example, defendant claims it was improper for the State to argue that Rico and Chambers feared retaliation against their testimony when there was no evidence of it in the record. However, the record indicates that the trial court sustained defendant's objections to the argument regarding Rico and instructed the jury to disregard the remark, thereby curing any possible error. (See *People v. Morando* (1988), 169 Ill. App. 3d 716, 739, 523 N.E.2d 1061, 1077.) The record also indicates that the objection to argument as to Chambers' fear was overruled as responsive to defense counsel's remarks in closing argument. The State is permitted to make comments in rebuttal argument that are invited by defense arguments. *Morando*, 169 Ill. App. 3d at 733, 523 N.E.2d at 1074.

Defendant contends that the State improperly used the evidence that a baseball bat was found in codefendant's apartment in the closing argument against defendant. Defendant also contends that the State improperly inferred that Williams' motive to kill decedent was "humiliation" from the fight with decedent. Defendant further con-

tends he was prejudiced by the State's rebuttal argument that defendant "dumped the gun in a dumpster." During closing arguments, the State is allowed to make reasonable inferences from the evidence presented at trial. The record here contains testimony that defendant was the shooter. The record also shows that the gun was not found on defendant or in any place he had been seen by the witnesses. It is not unreasonable to infer from the record, therefore, that the gun that was seen in defendant's hand was somewhere else. The record indicates that the State argued that defendant had thrown the gun in a dumpster, hidden it in codefendant's building or otherwise secreted it; the State did not argue as fact that the gun was thrown in a dumpster.

Defendant objects to the State's rebuttal argument that Robert Butler had a motive to testify falsely, as evidenced by the fact that he was sitting near defendant's mother in the courtroom during closing argument. Clearly, Butler's position in the courtroom during closing argument was not evidence presented at trial. The argument was improper. Nevertheless, the comment was not such that it could have reasonably affected the verdict in the case, thus rendering the error harmless. Furthermore, based on our conclusion regarding the arguments of gang affiliation, we conclude that the cumulative impact of the errors made in closing argument does not warrant reversal in this case.

## IV

Defendant next argues that the State failed to lay a proper foundation for the impeachment of Chambers on the issue of whether she saw defendant and codefendant enter codefendant's building after the altercation. Before a prior inconsistent statement of a witness is allowed into evidence, counsel must lay a foundation by directing the attention of the witness to the time, place, circumstances and subject of the inconsistent statement. *People v. Cobb* (1983), 97 Ill. 2d 465, 479, 455 N.E.2d 31, 37.

■ In this case, Chambers was asked about the statement she gave to the police after the shooting. The record shows that she was not asked specifically whether she told the police she saw defendant and codefendant enter the building. The State thus failed to meet the conventional standards normally required to provide a foundation for impeachment by prior inconsistent statement. Nevertheless, in *People v. Henry* (1970), 47 Ill. 2d 312, 265 N.E.2d 876, our supreme court held that an unconventional foundation was adequate to permit impeachment where there was no unfair surprise and the witness has

the opportunity to explain the statement. (See *Henry*, 47 Ill. 2d at 321-22, 265 N.E.2d at 882.) The record on appeal in this case indicates that the State, after drawing Chambers' attention to the statement she gave to the police following defendant's arrest, asked the following question:

"Did you tell the police that after the fight you saw Wesley and Alan *come back out of the building* and that Wesley had a gun in his hand?" (Emphasis added.)

Chambers denied making the statement. Viewed in the context of the examination as a whole, the question may be read to imply that Chambers saw defendant and codefendant enter the building. The question does not merely ask whether she saw defendant and codefendant come out of the building after the fight; it asks whether she saw them come *back* out of the building after the fight. In addition, defendant has made no showing that he was surprised by the testimony at issue. Given the facts and circumstances of this case, we conclude that the trial court did not abuse its discretion in permitting the impeaching testimony.

## V

■ Defendant next contends that the trial court erred by refusing to allow impeachment of Rico through the testimony of Albert Krawczyk. However, defendant failed to raise this argument in his post-trial motion, thereby waiving it on appeal.

## VI

Finally, defendant argues that the trial court denied him a fair trial by inquiring into the numerical division of the jury during deliberations and coercing the jury into rendering a guilty verdict against him.

Generally, a trial court should not inquire into the numerical division of the jury. (*E.g., People v. Santiago* (1982), 108 Ill. App. 3d 787, 439 N.E.2d 984.) In *Santiago*, however, the record indicated that the trial court inquired not only into the numerical division of the jury, but also into which verdict the majority favored. (See *Santiago*, 108 Ill. App. 3d at 806-07, 439 N.E.2d at 997.) Where the trial court does not ask the jury foreperson to reveal which verdicts the majority favored, any error arising from the inquiry is harmless. *People v. Craddock* (1987), 163 Ill. App. 3d 1039, 1045-46, 516 N.E.2d 1357, 1362.

■ In this case, the portion of the record quoted by defendant indicates that the trial court indicated that it did not want to know

which verdicts the majority favored. Accordingly, any error arising from the inquiry is harmless in this case.

It is improper for a trial court to coerce a verdict from a jury. (See, *e.g., People v. Ferro* (1990), 195 Ill. App. 3d 282, 551 N.E.2d 1378; *People v. Friedman* (1986), 144 Ill. App. 3d 895, 494 N.E.2d 760; *People v. Robertson* (1981), 92 Ill. App. 3d 806, 416 N.E.2d 323.) However, informing a jury that it will be sequestered after a certain time is not necessarily coercive. (*Ferro*, 195 Ill. App. 3d at 292, 551 N.E.2d at 1385.) Likewise, while the length of deliberations after such comments is relevant to the issue of coercion and may give rise to an inference of coercion in some cases, the timing of the verdict is inconclusive by itself. *Ferro*, 195 Ill. App. 3d at 292, 551 N.E.2d at 1385.

In this case, the record suggests that the jury reached a verdict approximately 30 to 35 minutes after being informed that plans for sequestration would have to be made for the evening. However, this is the sole factor that defendant has brought to the attention of this court. Moreover, the record indicates that the jury did not reach a verdict regarding codefendant at the time it reached a verdict regarding defendant. Given this record, defendant has failed to show that the trial court's comments coerced the verdict against him.

For all of the aforementioned reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

O'CONNOR, J., concurs.

PRESIDING JUSTICE MANNING, dissenting:

I disagree with the result reached by the majority and consequently I dissent. It is generally held that evidence indicating the defendant was a member of a gang or was involved in gang-related activity is admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act. (*People v. Miller* (1981), 101 Ill. App. 3d 1029, 428 N.E.2d 1038.) Such evidence, however, is only admissible where there is sufficient proof that such membership or activity is related to the crime charged. *People v. Wadley* (1988), 169 Ill. App. 3d 1036, 523 N.E.2d 1249.

In this case, the only evidence the State proffered of defendant Wesley King's gang activity was testimony by Rico that he had seen King in the company of Vice Lords, a rival gang. He testified that before he spoke to codefendant Williams about the $25 he owed to Williams, decedent told him not to talk to those "Hooks." Rico testified

that "Hooks" is a term for Vice Lords. He further testified that the Vice Lords and Disciples have "bad blood" between the two gangs. Rico also stated that he and decedent were members of the Disciples street gang, and that although codefendant Williams was not a member of the Vice Lords at the time of the incident, codefendant Williams had been a member of that gang. I find the evidence presented was not sufficient to prove King's gang membership, activity or that the murder was gang related.

Defendant cites *People v. Smith* (1990), 141 Ill. 2d 40, 565 N.E.2d 900, for the proposition that where the State's theory of gang membership to show motive is not supported by the evidence, reversal of a defendant's conviction is required. In *Smith*, defendant was convicted of murdering a State prison warden who had a reputation for being tough on gang-related activity at the prison. The State's theory of the case was that the warden had been killed by orders of two inmates who were allegedly gang members and had previously had an altercation with the warden. At trial, an assistant warden testified that he had known decedent all his life. Over defense counsel's objection, the State attempted to elicit testimony from the assistant warden concerning the type of gang activity existing in the prison system. After a sidebar, the court allowed the State to introduce evidence that: the two inmates had previously had an altercation with the warden; there was gang activity in prison; and decedent was a strict disciplinarian. In reversing the appellate court, the Illinois Supreme Court stated that the evidence offered by the State to prove motive was of little probative value. The only evidence offered indicated that there was a variety of gang-related activity in the prison; that the warden was intolerant of such activity; that two inmates at the prison had had an altercation with the warden; and that defendant had been seen in an apartment of one of these inmates on one prior occasion. The court held that this evidence was "simply too slim a thread upon which to tie the State's theory of motive." *Smith*, 141 Ill. 2d at 59; accord *People v. Maisonet* (1979), 138 Ill. App. 3d 716, 486 N.E.2d 277, 279.

I find the *Smith* decision instructive. The fact that King here had been seen in the company of gang members on a prior occasion is inconclusive of whether King in fact was a member of or active with a gang. In reviewing the record, I find no additional evidence to support the State's theory that the murder of decedent was related to King's alleged gang affiliation. The witness did not testify to the circumstances of King's past presence in the company of gang members, or to the number of occasions he had seen King in their presence. There was no evidence of King or anyone else present exchanging

gang symbols, no evidence of gang colors, or any other indicia of gang membership, and in fact, no evidence that King even heard decedent's comment about the "Hooks." The State's theory suggested that there was "bad blood" between the Vice Lords and Disciples. However, both Rico and codefendant Williams were friends. Additionally, the evidence at trial revealed that only a shoving and pushing match took place. The State never produced evidence that the group of men leaving the building were Vice Lords, nor that there was rivalry between the two gangs. There is a dearth of evidence to prove that King was acquainted with Stevon or knew him to be a member of any gang. Therefore, I conclude that the improper evidence of gang-related activity prejudiced the jury and constituted a material factor leading to King's conviction.

Additionally, as King further contends, the State compounded this error by its reference to gang-related activity both during opening statements and closing arguments, which in my judgment deprived him of a fair trial. The evidence of gang affiliation referred to both during the State's opening statement and in closing argument was nonexistent. The evidence did not show that King was a member of a rival gang and only showed that codefendant Williams once upon a time, but not presently, had been a gang member. There was not a scintilla of evidence that the individuals who came out of the building to watch the fight were members of the Vice Lords. In fact Butler, who was one of the men exiting the building (according to the State— a Vice Lord), and Rico (an admitted Disciple) were the two who broke up the fight. Additionally, Williams (according to the State—a Vice Lord) and Rico (an admitted Disciple) were friends. However, after explaining to the jury its theory of what it expected the evidence would show, it should have become clear after the State's witnesses testified that the anticipated testimony of gang affiliation did not exist. Moreover, there is nothing in the record to support the allegation that Rico feared retaliation by rival gang members if he was sent to the penitentiary or that Monique told two different stories because she was afraid of gang retaliation.

Attorneys are allowed considerable leeway in making closing and rebuttal arguments, and the scope of closing argument falls within the discretion of the trial court. (*People v. Simms* (1988), 121 Ill. 2d 259, 520 N.E.2d 308.) However, improper remarks warrant reversal if substantial prejudice to defendant occurs. *People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200.

I reiterate that there was a lack of evidence in the record to support the theory that the murder was gang related and that Rico

feared gang reprisals if he went to the penitentiary. Therefore, the comments by the prosecutor during closing and rebuttal argument intimating this were substantially prejudicial to King. This is particularly true where the prosecutor persisted in argument after the court admonished him not to refer to Rico's fear of gang reprisals if he went to prison. *People v. Mullen* (1990), 141 Ill. 2d 394, 404, 566 N.E.2d 222; *People v. Hovanec* (1976), 40 Ill. App. 3d 15, 351 N.E.2d 402.

I further find that the court erred by allowing the State to impeach its own witness without laying a proper foundation. During direct examination of Monique Chambers, the following questions were asked:

> "[Prosecutor]: *** After the fight ended, where did Wesley and Alan go?
>
> [Monique]: Around to the front of the building.
>
> Q. Did you see whether or not they went into the building?
>
> A. No.
>
> [Defense Counsel]: Objection.
>
> THE COURT: Overruled.
>
> [Prosecutor]: Did you see where they went at all after they went around to the front of the building?
>
> A. No."

Subsequently, the State called Detective Carey as an impeaching witness. Detective Carey made reference to statements made by Chambers to him, and defense counsel objected. At sidebar, the State made an offer of proof that Detective Carey would testify, among other things, that Chambers *told* him she saw defendant and Williams run back into the building after the fight. The court determined that the proper foundation had been laid. The court advised defense counsel that Chambers could be subpoenaed back to testify again. Carey then testified as follows:

> "[Monique] said after the altercation between Stevon Draine and Mr. Williams that Mr. Williams and an individual by the name of Wesley King left their presence and walked into a building which would have would be approximately—approximately 2409 East 72nd Street. It's right on the corner of 72nd and Phillips. They went into that building."

It is true that a witness may be impeached by proof that she made a statement outside of court contradicting her in-court testimony, or that she failed to speak under circumstances where it would have been natural to relate the matter testified to in court if true.

However, before a prior inconsistent statement of a witness is allowed into evidence for impeachment purposes, a proper foundation must be laid. (*People v. King* (1987), 157 Ill. App. 3d 76, 511 N.E.2d 685.) The impeachment of a witness with a prior inconsistent statement must be preceded by directing the attention of the witness to the time, place, circumstances and substance of the inconsistent statement. *People v. Cobb* (1983), 97 Ill. 2d 465, 455 N.E.2d 31; *People v. Cowper* (1986), 145 Ill. App. 3d 1074, 493 N.E.2d 729.

Here, the court itself expressed some doubt in allowing the testimony into evidence. The court stated that, "I may be criticized for [letting it in, but] I'm going to let it all come in, both sides." The court erroneously determined that a proper foundation had been laid for the statement, and Detective Carey was allowed to testify as to the alleged inconsistent statement.

I have carefully reviewed the record and find that a proper foundation necessary for impeachment was not established. While Chambers acknowledged on direct examination that she had spoken to a detective about having seen Wesley with a gun, having heard a shot and seen fire coming from the gun, she never was asked by the prosecutor whether she told the officer that she saw Williams and defendant enter the building after the fight. The State, in its brief, seems to have misconstrued which statement the defense takes issue with.

The prosecutor did not direct Chamber's attention to the time, place, circumstances and substance of any alleged inconsistent statement purportedly made by her about defendant entering the building. The court's recollection was in error recalling that the proper foundation had been laid. By failing to require the State to lay the proper foundation before allowing introduction of the prior inconsistent statement, the court erred. The question then becomes whether the error was harmless.

In determining whether evidentiary errors may be categorized as harmless, we must look to whether the "properly admitted evidence is so overwhelming that no fair-minded jury could reasonably have voted to acquit the defendant." *People v. Carlson* (1982), 92 Ill. 2d 440, 449, 442 N.E.2d 504.

While the majority concedes that the State failed to lay a proper foundation, but attempts to minimize its significance, the importance of this error becomes evident in the context of what Monique's testimony had established. It revealed that during the altercation between codefendant Williams and decedent Draine, Monique was standing 35 to 40 feet south on Phillips. The building extended for almost an entire one half of the block on Phillips. When the fight ended, Stevon

walked south on Phillips to rejoin Monique, Anita and Rico. It is undisputed that codefendant Williams and King walked around the corner on 72nd Street and both State occurrence witnesses testified that it was impossible to see around the corner. Consequently, it would have been impossible for Monique to have seen Williams or King enter Williams' apartment building. Moreover it is undisputed that neither of the defendants was armed with a gun during the fight. Hence, the State was unable to show that either of the two defendants ever entered Williams' apartment after the fight ended to obtain a weapon, which was the State's theory as it sought to impeach Monique as to this fact. Accordingly, I find the court's error in allowing the State to impeach Monique in the absence of a proper foundation was prejudicial to King and reversible error.

Moreover, the State presented two witnesses, one of whom was a convicted felon who was given leniency in a pending case in exchange for his testimony in the case at bar. The other was Monique Chambers, whose prior inconsistent statement placed the gun in King's hand. However, at trial she recanted that statement. Ms. Chambers' credibility, or lack thereof, was placed into issue by the State, notwithstanding that she was a prosecution witness.

While the State suggests in its brief that Monique's statement was offered both as impeachment and as substantive evidence, the State apparently misconstrues the requirements of the statutory provision that allows certain prior inconsistent statements to be received as substantive evidence. As a prerequisite to its admission under the statute, the prior statement must either have been made under oath at a trial, hearing or proceeding, or proved to have been written or signed by the witness, or the witness acknowledged under oath the making of the statement, either in his testimony at a trial, or in some other hearing, or the statement is proved to have been sound recorded by electronic means.

As previously pointed out, at trial the State failed to elicit from Monique whether she acknowledged making the prior statement and clearly there is no evidence that the prior statement was under oath, in writing or sound recorded. Hence, it is clear that the State failed to meet the requirements of the statute and the statement was not properly received as substantive evidence.

Credibility was the crux of the case, and the evidence was not close to being overwhelming considering the type of witnesses the State presented. The court expressed its willingness to accept Chambers' statement provided the proper foundation was laid. The court stated:

"Substantive or impeaching is one thing but I think you should lay a foundation first *** just lay a foundation."

After a lengthy colloquy with both counsel, the court appears to have accepted all of Detective Carey's testimony as impeachment. The court ruled:

"I'm going to let it all in because you're still going to go to impeachment. I'll let it all in."

It clearly appears from the record that the proper foundation had not been laid for impeachment, although the court allowed the statement into evidence for that purpose. Hence, I would find that the error was prejudicial and mandates reversal.

King further maintains that the trial court erred by refusing to allow a defense witness to proffer testimony that would have impeached the credibility of the State's key witness. The State asserts that the court acted within its discretion by disallowing the testimony into evidence because the witness had already admitted making the statement upon cross-examination. Defense counsel asked the State's witness, Rico, if he recalled stating to Krawczyk that if he were called to testify he might lie or he might tell the truth. Rico stated on cross-examination:

"No. I told him that if I was called, I would tell the truth. I told him—I told him that. I told—I told, you know, you know, I told him a story, you know. That is what I told him. I told you, if they do call me, I will tell the truth. I am not going to —."

During King's case, defense counsel asked Albert Krawczyk whether Rico was questioned about his testimony in the case. The State objected on the grounds that the witness had admitted talking with Krawczyk and that any additional testimony would be cumulative hearsay. The court held a sidebar, after which it stated that the witness had admitted that he made the statement. Therefore, according to the court's recollection, any testimony by Krawczyk would not have been impeaching, and the State's objection was sustained.

However, as reflected by the above quotation from the record, clearly Rico denied making a statement to attorneys that he might lie on the witness stand if called to testify. Defense counsel then made an offer of proof that Krawczyk would testify that Rico said if he was called to testify in the case he did not know if he would lie or tell the truth. The court's ruling not to allow the impeachment testimony was based on its imprecise recollection that Rico had admitted to making the statement and that the statement would therefore not be impeaching.

The majority concludes that defendant failed to raise this argument in his post-trial motion and that it is therefore waived. Although it is true that defendant failed to raise the issue of the court's failure to allow impeachment of Krawczyk in his post-trial motion, I have carefully reviewed the State's brief and find that no issue arguing waiver is raised therein. Further, there are exceptions to the waiver rule when there has been plain error affecting substantial rights which deprive the accused of a fair and impartial trial. (*People v. Smith* (1990), 141 Ill. 2d 40, 55, 565 N.E.2d 900.) Application of the plain error exception is appropriate here in light of the State's prejudicial reference to gang-related activity and the type of witnesses presented by the State. There was no evidence of defendant's membership in or activity with a gang, nor did the witness who testified provide evidence of the circumstances surrounding defendant's past presence in the company of gang members. Moreover, as mentioned earlier, one of the witnesses presented by the State was a convicted felon who was given leniency for his testimony, and Chambers' testimony was less than credible. The errors committed in opening and closing arguments by the State could conceivably have inflamed the jury. Moreover, the trial court allowed testimony by Chambers into evidence without requiring the proper foundation.

I find that King was denied a fair trial by the cumulative effects of the court's admission of testimony and argument relating to gang affiliation, the admission of a State witness' testimony without the requisite foundation being laid, and the court's failure to grant defendant the opportunity to impeach a State witness. I conclude that these factors were substantially prejudical and constituted a material factor leading to his conviction. (*Smith*, 141 Ill. 2d at 79.) Accordingly, I would reverse and remand for a new trial.

Therefore, I respectfully dissent.